### DI PASQUALE v. KARNUTH et al.

No. 77, Docket 20347.

Circuit Court of Appeals, Second Circuit.

Jan. 11, 1947.

Benedict T. Mangano, of Albany, for appellant.

R. Norman Kirchgraber, of Buffalo, for appellees.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

DiPasquale appeals from an order, dismissing a writ of habeas corpus to review an order, deporting him to Italy for two reasons: (1) Because he had been convicted of robbery before he entered the United States; and (2) because he had been again convicted within five years after he had entered, and had been sentenced for more than a year.[1] The facts were as follows. DiPasquale lawfully entered the United States from Italy on June 21, 1907, at the age of fourteen; he has resided in Buffalo thereafter during all the period here involved. On May 11, 1915, he was convicted of robbery (the length of the sentence does not appear), and he was again convicted of robbery on June 5, 1919 (his sentence then being for thirty-eight years). He was released on parole on December 13, 1937; but was arrested for deportation two years later, and was ordered deported on June 11, 1945. Admittedly, he is subject to deportation, if he re-entered the United States on September 15, 1918; and admittedly he is not so subject, if he did not: that is the only issue in the case. His supposed re-entry was on the night of September 15, 1918, when he went by sleeping car from Buffalo to Detroit upon the Michigan Central Railroad, whose route lies through Canada. He was asleep during the time he was outside the United States, and woke up in Detroit; there was no evidence that he "knew or had any intention of leaving the United States or of entering Canada." The ticket agent who sold his ticket over the route did not volunteer any explanation of where the car would go except as to the terminus, and passengers were guarded so that "they could not leave the train in Canada."

If the word, "entry," in the statute extends to the mere physical passage of an alien across the boundaries of the United States, regardless of any intent, the order was right; but, if so, an alien who is arrested or abducted, and carried against his will out of the country and then back again into it, makes an "entry." We do not understand that the Director of Immigration takes this extreme position; certainly no court has done so; the furthest stretch given to the word was in Ward v. DeBarros,[2] and even there the court, arguendo, excluded an involuntary entry. However, that is not the case at bar; DiPasquale was not carried out of, and back into, the United States against his will; he boarded a car which, had be inquired, he would have learned would take him outside the United States and back into it.

---

[1] § 155, Title 8 U.S.C.A.

[2] 1 Cir., 75 F.2d 34.

True, he did not know its route, but he acquiesced in whatever route the railroad might choose to pull the car; and if the factor of intent is satisfied by such an acquiescence, he made an "entry." That is what the First Circuit held in Ward v. DeBarros, supra.[2] On the other hand, if the necessary intent demands knowledge by the alien that the route which he is to take will carry him across our borders, then DiPasquale did not enter when, asleep, he came into Detroit. In Zurbrick v. Borg,[3] the Sixth Circuit held that if the alien did know this, he "entered"; and we agree. Taguchi v. Carr[4] is not in point; true, Taguchi was forced outside the United States, and it was a hard constraint that put him to the choice; but he did choose to re-enter and knew he was entering when he did. Claussen v. Day,[5] so far as it counts at all, counts in DiPasquale's favor; and these are the only decisions near enough to deserve discussion.

With deference, we cannot follow Ward v. DeBarros, supra;[6] we think that the intent of a carrier, unknown to the alien, to carry him across a border and back again, upon a route whose termini are within the United States, should not be imputed to him. Were it otherwise, the alien would be subjected without means of protecting himself to the forfeiture of privileges which may be, and often are, of the most grave importance to him. He would be charged with the duty, every time he set foot upon a public conveyance to inform himself of its projected journey. Even if aliens were adequately advised of the danger, this would be a serious, and quite useless, burden to impose upon them; but there is nothing to advise them, and the duty would in practice become a trap, whose closing upon them would have no rational relation to anything they could foresee as significant. We cannot believe that Congress meant to subject those who had acquired a residence, to the sport of chance, when the interests at stake may be so momentous.

True, DiPasquale has shown himself to be a most undesirable member of our community; more than that, there can be no doubt that if he had been convicted of his first crime after May 1, 1917, instead of in 1915, and if he had been imprisoned for a year for it, he could now be deported. The fact that he had come here as a boy, that deportation would be in substance exile, and that he was as much the product of our society as though he had been born here: all these would make no difference: the statute makes no distinction between one who came here as an adult and one who came here as a babe in arms. We could not choose but to leave him to his fate, however cruel. But concededly he was not subject to deportation except for his journey between Buffalo and Detroit; he had a vested interest in his residence, which could not be impaired so long as he avoided another conviction. That interest is now to be forfeited because of perfectly lawful conduct which he could not possibly have supposed would result in anything of the sort. Caprice in the incidence of punishment is one of the indicia of tyranny, and nothing can be more disingenuous than to say that deportation in these circumstances is not punishment. It is well that we should be free to rid ourselves of those who abuse our hospitality; but it is more important that the continued enjoyment of that hospitality once granted, shall not be subject to meaningless and irrational hazards.

Order reversed; relator discharged.

---

[2] 1 Cir., 75 F.2d 34.

[3] 47 F.2d 690.

[4] 9 Cir., 62 F.2d 307.

[5] 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758.

[6] 1 Cir., 75 F.2d 34.