**GONZALES v. BARBER, District Director, Immigration and Naturalization Service, San Francisco, Cal.**

**No. 13566.**

United States Court of Appeals, Ninth Circuit.

Sept. 15, 1953.

Writ of Certiorari Granted

Dec. 14, 1953.

See 74 S.Ct. 274.

Bone, Circuit Judge, dissented.

Gladstein, Andersen & Leonard, Lloyd E. McMurray, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and HEALY and BONE, Circuit Judges.

DENMAN, Chief Judge.

This is an appeal from a judgment of the United States District Court for the Northern District of California, denying a petition for a writ of habeas corpus to a native of the Philippine Islands held for deportation.

The questions presented are: (1) whether appellant has been twice convicted of crimes involving moral turpitude and (2) whether the lawful coming into the continental United States from its possession the Philippine Islands by a native thereof prior to the Philippine Independence Act of 1934, 48 Stat. 456, is an "entry" into the United States within the provisions of § 19 of the Immigration Act of 1917, formerly 8 U.S.C. § 155.[1]

Gonzales, a native of the Philippine Islands, lawfully came into the continental United States at the age of 17 in 1930, and has since resided there. In 1941. he was charged with the crime of assault with a deadly weapon with the

---

1. Immigration and Nationality Act of 1952, § 241, 8 U.S.C.A. § 1251.

intent to commit murder. He was tried and convicted of the lesser crime of assault with a deadly weapon, and was sentenced to a term of one year in the Alameda County Jail, of which he served ten months. In 1950, Gonzales was convicted of the crime of second-degree burglary and was sentenced under Washington's indeterminate sentence law to the State Penitentiary at Walla Walla and there served two years.

A warrant of arrest was issued by the Immigration and Naturalization Service on October 4, 1950, charging that after his entry into the United States he had "been sentenced more than once to imprisonment for terms of one year or more because of conviction in this country of crimes involving moral turpitude, committed after entry, to-wit: Assault with a deadly weapon, and burglary in the second degree." Warrant hearing proceedings were then held at which appellant·was represented by counsel, and thereafter a warrant for the deportation was issued on July 25, 1951.

After the Order of Deportation had been issued, appellant petitioned for a writ of habeas corpus to the United States District Court for the Western District of Washington, Northern Division. The petition was denied. Thereafter, Gonzales was transferred to San Francisco to effect his deportation. There, the current petition for habeas corpus was filed and denied by the district court and this appeal followed.

■ Gonzales first claims that the crime of assault with a deadly weapon, of which he was convicted in the California courts, does not—under the circumstances involved—constitute a crime involving moral turpitude. He argues that the crime was only a misdemeanor inasmuch as he was not sentenced to the State Prison. See California Penal Code, § 17. While this is true, it is irrelevant. The gravity of the punish-ment imposed upon the alien is not determinative of the question of whether the crime is one involving moral turpitude. U. S. ex rel. Zaffarano v. Corsi, 2 Cir., 63 F.2d 757.

■ Secondly, he argues that the crime is not, per se, one which involves moral turpitude. A California case is cited in which it was held that an assault with a deadly weapon was not such a crime for purposes of disbarment of an attorney. In the Matter of Disbarment of Rothrock, 16 Cal.2d 449, 106 P.2d 907, 131 A.L.R. 226. However, there the California court was concerned with whether the crime involved such moral turpitude as to reflect upon the attorney's moral fitness to practice law, a state question. Here we are faced with the federal question of whether the crime involves such moral turpitude as to show that the alien has a criminal heart and a criminal tendency—as to show him to be a confirmed criminal. Fong Haw Tan v. Phelan, 333 U.S. 6, 9, 68 S.Ct. 374, 92 L.Ed. 433. In the federal law, assault with a deadly weapon is such a crime. U. S. ex rel. Zaffarano v. Corsi, supra; U. S. ex rel. Mazzillo v. Day, D.C.S.D.N.Y., 15 F.2d 391; U. S. ex rel. Ciccerelli v. Curran, 2 Cir., 12 F.2d 394; Weedin v. Tayokichi Yamada, 9 Cir., 4 F.2d 455.

■ Gonzales next contends that he is not within the statutory class referred to in the deportation order. He claims that he is not an alien but a national of the United States. This contention is without merit. Gonzales became an alien on July 4, 1946, upon the proclamation of Philippine Independence. Mangaoang v. Boyd, 9 Cir., 205 F.2d 553; Cabebe v. Acheson, 9 Cir., 183 F.2d 795.

Gonzales claims that he is not within the intent of § 19 of the Immigration Act of 1917, former 8 U.S.C.A. § 155 (the applicable portions of which are set forth in the margin).[2] His argu-

---

2. § 19, Immigration Act of 1917: "* * * except as hereinafter provided, any alien who, after May 1, 1917, is sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involv-

ment essentially is that he was not an alien until Philippine Independence and hence that as to acts occurring prior to the time the statute is inapplicable. Section 8(a) (1) of the Philippine Independence Act of 1934, 48 Stat. 456, 462, provides in part that: "For the purposes of the Immigration Act of 1917 * * * and all other laws of the United States relating to the immigration, exclusion, or expulsion of aliens, citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens."

The District Director argues that this statute compels a conclusion that Gonzales was to be treated as an alien at the time he was convicted of assault with a deadly weapon in 1941. The Immigration Act of 1917 was one of the statutes specifically envisioned by Congress in providing that for its purposes Filipinos "shall be considered as if they were aliens." Since both convictions occurred after the effective date of the Philippine Independence Act of 1934, Gonzales is properly subject to deportation under § 19 of the Immigration Act of 1917 if he is otherwise subject to its terms.

■ Gonzales contends that he is not otherwise subject to the terms of that statute, because when he came into the United States in 1930, he did not make the "entry" required by § 19 of the Immigration Act of 1917 cited supra. This contention is meritorious. In Mangaoang v. Boyd, supra, it was stated, one judge reserving judgment, that a Filipino who came into the United States prior to the Philippine Independ-ence Act had not technically "entered" the United States and hence that Section 22 of the Internal Security Act of 1950 U.S.Code Congressional Service 1950, p. 984 (providing that aliens who, at the time of entering the United States or at any time thereafter, are members of the Communist Party of the United States, shall be deported) was inapplicable. Here we are dealing with the portion of Section 19 of the Immigration Act of 1917 concerning convictions for two crimes involving moral turpitude "committed at any time after entry". The question then is whether Gonzales had made an "entry" as that word is used in the clause last quoted.

In U. S. ex rel. Volpe v. Smith, 289 U.S. 422, 425, 53 S.Ct. 665, 77 L.Ed. 1298, "entry" was defined as including "any coming of an alien from a foreign country into the United States." This definition was followed in subsequent cases, Delgadillo v. Carmichael, 332 U. S. 388, 68 S.Ct. 10, 92 L.Ed. 17; U. S. ex rel. Schlimmgen v. Jordan, 7 Cir., 164 F.2d 633, and has been adopted by the Immigration and Nationality Act of 1952, § 101(a) (13).[3] At the time Gonzales arrived in this country in 1930, he was not an *alien* and hence not covered though coming from a foreign country or outlying possession, but was a United States *national* coming from an outlying possession. There has been no "entry" by an alien, and hence there have not been two crimes involving moral turpitude "committed at any time after entry". It follows that Gonzales is not subject to deportation under Section 19 of the Immigration Act of 1917.

---

ing moral turpitude, **committed within five years after the entry of the alien to the United States, or** who is sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed **at any time after entry**; * * * shall, upon the warrant of the Attorney General, be taken into custody and deported. * * * The provisions of this section, with the exceptions hereinbefore noted, shall be applicable to the classes of aliens therein mentioned **irrespective of the time of their entry** into the United States; and shall also apply to the cases of aliens who come to the mainland of the United States from the insular possessions thereof." (Emphasis supplied.)

3. Immigration and Nationality Act of 1952, Sec. 101(a) (13), 8 U.S.C.A. § 1101(a) (13):

"(13) The term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether **voluntarily or otherwise**, * * *."

We recognize the fact that this definition of the word "entry" is not its plain and obvious meaning, but we also recognize that the word has become a word of art. While it is true that the ultimate holdings in Volpe v. Smith, supra, and U. S. ex rel. Schlimmgen v. Jordan, supra, were that the coming of an alien into the United States for the second time was an "entry," we do not rely upon the holding of these cases but merely cite them as showing the narrow meaning which has been ascribed to the word.

█ To the contention that the holdings in Delgadillo v. Carmichael, supra, and Di Pasquale v. Karnuth, 2 Cir., 158 F.2d 878, were necessary to avoid an obvious injustice and hence do not support our position, it should be noted that not all judges agree on what is an "obvious injustice"; in fact this court did not see the obvious injustice in the Delgadillo case, Del Guercio v. Delgadillo, 9 Cir., 159 F.2d 130. No appellate case has been found which ascribes any other meaning to the term "entry" than that used here. The meaning of a term used in a statute cannot mean one thing for one situation and something else for a different situation else the law would not have that reasonable certainty which the people have a right to expect.

The definition of entry set out in § 101(a) (13) of the Immigration and Nationality Act of 1952 is not cited because we think it controlling in this case, but only because it shows that Congress, in revising the immigration and nationality laws, recognized what we hold to be the judicial meaning of the term in relation to immigration and nationality statutes.

For the contention that we should give the plain and ordinary meaning of the word entry is quoted a passage written by Justice Rutledge speaking for a majority of the Supreme Court in a case involving a *criminal* statute, United States v. Brown, 333 U.S. 18, 25, 26, 68 S.Ct. 376, 92 L.Ed. 442. We prefer to rely upon the statement of Justice Douglas made on the same day the Brown case was decided speaking for a unanimous court in a *civil* case involving Section 19 of the Immigration Act of 1917, in which this court was reversed for giving a broad construction of the very statute with which we are here concerned, Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433:

"We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, [92 L.Ed. 17]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

The word entry has been here given the narrow meaning which has been ascribed to it in many cases. See Mangaoang v. Boyd, 9 Cir., 205 F.2d 533, and the cases cited in footnote 5.

The judgment of the district court is reversed and the cause remanded with instructions to issue the writ and to order Gonzales' discharge.

BONE, Circuit Judge (dissenting).

I dissent.

The majority correctly holds that Gonzales has twice been convicted in this country of crimes involving moral turpitude within the meaning of § 19 of the Immigration Act of 1917 (formerly 8 U.S.C.A. § 155). From the record before us it is clear that appellant came to the United States in 1930 and has since resided continuously therein. He is an alien and is subject to the provisions of Section 155, supra; an order for his deportation has been issued on the ground that he has been convicted

and sentenced for the offenses above mentioned. Therefore he is deportable.

When Gonzales came to the United States he quite obviously made an "entry" into this country in the usual and accepted sense of that term. And generally the plain and obvious meaning of a statute is preferred to a curious, hidden signification. Payne v. Ostrus, 8 Cir., 50 F.2d 1039, 77 A.L.R. 531; United States v. Missouri Pacific Ry. Co., 8 Cir., 213 F. 169. The majority, however, attaches to the word "entry" in the applicable expulsion statute a meaning which is certainly curious and very well hidden. The word, they say, means entry by aliens and by no other class of persons. It is urged that since at the time of his coming to the United States Gonzales was *a national* and beyond the reach of *all laws relating to aliens,* he did not make an "entry" and therefore is not deportable.

I reserved judgment when the same proposition was expressed by the majority in Mangaoang v. Boyd, 9 Cir., 205 F.2d 553. The decision in that case was supportable upon another ground. After considering argument of the same question here, I cannot accept the view now advanced by the majority.

Ordinarily when a court declines to apply a statute according to the plain meaning of its terms it is for one or more of the following reasons: (1) the statute itself clearly indicates that the words are used in a special, technical sense; (2) the words have an established judicial meaning in the field of law in which the statute is to operate; (3) to give the words of the statute their plain meaning would be inconsistent with the object and purpose of the statute as a whole; (4) to apply the statute according to its terms would be to attribute to Congress a capricious purpose and lead to an unconscionable result.

*First.* The majority do not, and they could not, justify their "highly technical" construction of the word "entry" by an analysis of the statute itself. Section 19 of the Immigration Act of 1917, quoted in footnote 2 of the majority opinion, provides in pertinent part for deportation of aliens upon their conviction of certain crimes committed "at any time after entry". I see nothing in this language that induces the conclusion that the person involved must have been an alien at the time of his coming into the United States in order to be deportable.[1]

*Second.* The majority rely upon certain decisions of the courts as establishing that the term "entry" is and must be regarded as a word of art.

Aside from the majority holding in

1. The case of U. S. ex rel. Eichenlaub v. Shaughnessy, 338 U.S. 521, 70 S.Ct. 329, 94 L.Ed. 307, is helpful here. The question in that case was whether the person sought to be deported must have been an alien at the time of his conviction of a violation of the Espionage Act of 1917, 40 Stat. 217, in order to be deportable. The applicable expulsion provision, 8 U.S.C.A. § 157, made deportable "aliens who since August 1, 1914, have been or may hereafter be convicted of any violation or conspiracy to violate" the Espionage Act of 1917. The Supreme Court held an alien deportable under that provision although at the time of his conviction of espionage he was a naturalized citizen of the United States, saying " * * * the Act does not require that the offenders reached by it must have had the status of aliens at

the time they were convicted." 338 U.S. at page 530, 70 S.Ct. at page 333.

In light of that decision, I do not see how it can be seriously contended that the language of § 19 of the Immigration Act of 1917, standing alone, requires that the person involved must have been an alien at the time of his coming into the United States, as a condition precedent to his deportation. The argument for the requirement of simultaneous alienage and conviction under a statute making deportable "aliens who * * * have been or may hereafter be convicted * * *" (as in the Eichenlaub case), would appear to be even stronger than the argument (here accepted by the majority) for requiring simultaneous alienage and "entry" under a statute making the alien deportable upon conviction of certain crimes. if committed "at any time after entry".

our Mangaoang case, supra, to that effect, the cases do not support application of this "word of art" doctrine except under such exceptional circumstances as were present in the cases of Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17, and Di Pasquale v. Karnuth, 2 Cir., 158 F.2d 878. In those cases it was held that when an alien's departure to a foreign place was *not intended or voluntary* his return was not an "entry" within the meaning of a statute subjecting aliens to deportation for crimes committed "within five years after entry". In the Di Pasquale case the critical "entry" occurred when the alien, while asleep in a railroad sleeping car, was transported into Canada and back into the United States by the route of a passenger train on a journey from Buffalo to Detroit. In the Delgadillo case the "entry" occurred when the alien, a member of the crew of an American vessel, was plunged into the sea as a result of the torpedoing of his ship, then rescued and taken care of in Cuba for a short time before returning to the United States. In each case, but for the fortuitous departure and "re-entry", the alien would not have been subject to deportation. In both cases the courts, with good reason, concluded that it would be a capricious and unconscionable application of the statute to hold the alien deportable under these extraordinary circumstances. By way of elaboration we might well quote the Supreme Court in the Delgadillo case, 332 U.S. at page 391, 68 S.Ct. at page 12, where it is said: "We might as well hold that if he had been kidnapped and taken to Cuba, he made a statutory 'entry' on his voluntary return. Respect for law does not thrive on captious interpretations." This illustrates how the Supreme Court met exceptional circumstances by applying exceptional treatment to avoid an obvious injustice.

The majority also relies upon U. S. ex rel. Volpe v. Smith, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298, and United States ex rel. Schlimmgen v. Jordan, 7 Cir., 164 F.2d 633. In those cases it was held that the coming of an alien into the United States for the second time is an "entry" within the meaning of a statute subjecting aliens to deportation for crimes committed "prior to entry." Why these two cases are thought to support the majority view on the "entry" question here is not clear to me. My bewilderment increases when I read the language of the Supreme Court in support of its holding in the Volpe case: "An examination of the Immigration Act of 1917, we think, *reveals nothing sufficient to indicate that Congress did not intend the word 'entry' in § 19 should have its ordinary meaning.*" (Emphasis mine.) 289 U.S. at page 425, 53 S.Ct. at page 667.

These four cases do not support the majority holding. Nothing can be worked out arguendo from them which might bear on the question whether the coming of *a national* into the United States is an "entry" within the meaning of § 19 of the Immigration Act of 1917. The majority's reliance upon language in the Volpe, Delgadillo and Schlimmgen cases that an "entry" is "any coming of an alien from a foreign country into the United States" is a glaring example of reading language out of context. For in those cases the persons involved were, and always had been, *aliens*. The courts were therefore not concerned with making *a distinction* between entry by aliens and entry by any other class of persons nor did they purport to make such distinction. The language used had reference only to the very different questions involved in those cases.

In the Mangaoang case, though not in the instant case, the majority cited Del Guercio v. Gabot, 9 Cir., 161 F.2d 559. As will be pointed out shortly, this court did not in that case make any attempt to define the word "entry." The majority's interpretation of the word "entry," I submit, has no judicial precedent to support it.[2]

2. Even if it be assumed that the definition of "entry" set out in § 101 (a) (13) of the Immigration and Nationality Act of 1952, quoted in footnote 3 of the ma-

*Third.* If the word "entry" were given its plain and obvious meaning, would the result here be inconsistent with the object and purpose of the expulsion provisions of the Immigration Act of 1917 considered as a whole?

It is obviously futile to search for a Congressional purpose concerning the deportability of Filipinos in an Act pertaining to aliens passed at a time when Filipinos were nationals of the United States and long before they were made subject to its terms. But evidence of Congressional purpose in this regard may be found elsewhere. From the time of the passage of the Philippine Independence Act of 1934, 48 Stat. 456 et seq., until the Proclamation of Philippine Independence on July 4, 1946, the Independence Act controlled the *status* of citizens of the Philippines in the United States. If by that Act Filipinos such as Gonzales (who entered the United States prior to its passage) were made subject to the alien deportation statutes, it could hardly be contended that somehow and in some undisclosed manner they obtained complete immunity from deportation when the Independence Act became obsolete and Filipinos became aliens by the Proclamation of Philippine Independence in 1946, Proclamation No. 2695, 22 U.S.C.A. § 1394 note.

Section 8 of the Philippine Independence Act provided in pertinent part that "For the purposes of the Immigration Act of 1917 \* \* \* and all other laws \* \* \* relating to the \* \* \* expulsion of aliens, citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens."

Under the majority opinion an exception must be read into this provision. Insofar as the liability of Filipinos to expulsion is concerned, the majority would say that the Independence Act did not apply to those who on its effective date were *residents* of the United States. For these Filipinos, they say, made no "entry" into the United States and are therefore not subject to deportation.[3]

I cannot accept this view. The Independence Act did not distinguish between resident and non-resident Filipinos. And as has been pointed out, no court prior to the very recent Mangaoang case had ever held or even inferred that the word "entry" in the expulsion statutes meant entry by an alien only. If we today give the word this peculiar and highly technical construction and conclude therefrom that Congress meant to except resident Filipinos when it made Philippine citizens "aliens" *for the purposes of the expulsion statutes,* we attribute a remarkable subtlety of expression to that legislative body. It seems incredible to me that Congress meant to exclude the great body of Filipinos residing in the United States in 1934 from the sweep of § 8 of the Independence Act when it did not do so in express terms.

I think the Independence Act meant exactly what it said; that by that Act

jority opinion, is in line with the definition given that word by the majority here, that Act is not applicable to this case. And I note in passing that an interesting question might arise under that Act, in view of § 326 thereof, 8 U.S. C.A. § 1437, which provides:

Sec. 326. "Any person who (1) was a citizen of the Commonwealth of the Philippines on July 2, 1946, (2) entered the United States prior to May 1, 1934, and (3) has, since such entry, resided continuously in the United States shall be regarded as having been lawfully admitted to the United States for perma-

nent residence for the purpose of petitioning for naturalization under this title." (Emphasis mine.)

3. Under the majority opinion it may be that those Filipinos who at the time of the passage of the Independence Act resided in the United States and who subsequently departed to a foreign place and then returned (i.e., made an "entry") would be subject to the alien deportation statutes. But this is the only foreseeable instance in which Filipinos residing in the United States in 1934 might be subject to deportation under the majority's holding.

Filipinos not citizens of the United States were made subject to the expulsion provisions of our immigration acts. The language included both resident and non-resident Filipinos. This being so, Gonzales became subject to the expulsion statutes upon passage of the Independence Act and remained so subject when he became an alien by the Proclamation of Philippine Independence in 1946. From the available evidence on the subject, I conclude that the majority's strained construction of § 19 of the Immigration Act flies in the face of a clear congressional purpose.

Despite the statements in the majority opinion in the Mangaoang case, Del Guercio v. Gabot, supra, is not opposed to the view here expressed. In that case (Del Guercio v. Gabot) this court held (1) that where a Filipino was sought to be deported under so much of § 19 of the Immigration Act of 1917 as provided for expulsion upon conviction of crimes committed "within five years after entry", the entry was an essential element of the deportable conduct; and (2) the Independence Act would therefore not be retroactively applied to stamp the coming of the Filipino into the United States an "entry" within the meaning of the deportation provision.

The opinion in that case will be searched in vain for any statement that the word "entry" means the coming of an *alien only* into the United States. Had that been the view of this Court, the question there involved could have been speedily decided upon that ground. The decision rested upon a more solid basis. The Independence Act was by its terms prospective in operation. The applicable expulsion provision made an alien deportable for a crime *only* if the crime was committed within five years after entry. The specific time relationship between the "entry" and the commission of the crime was made vital. With good reason, therefore, this Court considered the "entry" an essential element of the deportable conduct, and refused to retroactively apply the Independence Act so as to stamp the coming

of the Filipino prior to its passage an "entry" within the meaning of the expulsion provision.

The Del Guercio case immunized from deportation only those Filipinos who came to the United States within five years prior to the Independence Act and committed a deportable offense after the passage of the Act and within five year after entry. It did not, as did the Mangaoang case and the instant case, give Filipinos residing in the United States at the time of the passage of the Independence Act a blanket immunity.

The distinction between the Del Guercio case and the instant case is clear. Under that portion of § 19 of the Immigration Act of 1917 here applicable, an alien is deportable upon conviction of two crimes of a described class if committed "at any time after entry". In such case the "entry" is not, in any real sense, an element of the deportable conduct, any more than is the birth of an accused an element of the crime with which he is charged. The application of the expulsion statute to Gonzales involves no retroactive application of the Independence Act. It does not make the Independence Act reach back to stamp acts of Gonzales prior to its passage "elements" of the conduct for which he has been ordered deported.

*Fourth.* There might be some justification for the majority's disposition of this case if to uphold the order of deportation would be to attribute to Congress an unconscionable purpose. But in this case we have an alien who since being subjected to the alien expulsion statutes has been twice convicted of serious crimes involving moral turpitude. Permitting the order of deportation to stand could scarcely be said to be more harsh than was the result in the Volpe or Eichenlaub cases, supra, where the Supreme Court did not permit any squeamishness to deter it from applying the expulsion statutes according to their terms.

Certainly deportation may be punishment but the rule of strict construction is not a license to courts to create am-

biguity where there is none, to proceed with indifference to a statute to reach a result which the court might think desirable. As was said by Justice Rutledge, speaking for the Supreme Court in United States v. Brown, 333 U.S. 18, 25, 26, 68 S.Ct. 376, 380, 92 L.Ed. 442:

"The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language. As was said in United States v. Gaskin, 320 U.S. 527, 530, 64 S.Ct. 318, 319, 88 L. Ed. 287, the canon 'does not require distortion or nullification of the evident meaning and purpose of the legislation.' Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers."

The judgment of the lower court should be affirmed.