### SAVORETTI v. VOILER.
No. 14954.

United States Court of Appeals
Fifth Circuit.

June 30, 1954.

James L. Guilmartin, U. S. Atty., Douglas P. Lillis, Dist. Counsel, U. S. Immigration Service, Miami, Fla., for appellant.

David W. Walters, Miami, Fla., for appellee.

Before STRUM, Circuit Judge, and DAWKINS and HOOPER, District Judges.

DAWKINS, District Judge.

Appellee was born in Roumania and entered the United States lawfully in 1892, having resided in this country since that date. In 1918 he was convicted of armed robbery in Michigan and was sentenced to a term of 15 to 30 years in prison. Four years later he was paroled.

Some time in 1951 (the record does not disclose the exact date) he visited Puerto Rico for a few days on business and returned to the mainland through Miami, Florida, on March 30, 1951, being admitted as a citizen. On December 5, 1951, he was arrested and charged in deportation proceedings with being in the United States in violation of immigration laws.[1]

Administrative proceedings resulted in an order for appellee's deportation, and on September 10, 1953, he was taken

---

[1] The specific violation charged was under Section 19 of the Immigration Act of February 5, 1917, as amended, 39 Stat. 889–890; 54 Stat. 671–673; 56 Stat. 1044, the pertinent provisions of which were: "That at any time within five years after *entry* * * * any alien who was convicted, or who admits the commission, prior to *entry*, of a felony or other crime or misdemeanor involving moral turpitude * * * shall, upon the warrant of the Attorney General, be taken into custody and deported * * * Provided further, That the provisions of this section *shall also apply to the cases of aliens who come to the mainland* of the United States *from the insular possessions thereof* * * *." (Emphasis supplied.)

into custody by appellant pursuant to the order. Appellee filed a petition for a writ of habeas corpus, challenging the legality of his detention on several grounds, the only contention presented by this appeal being that the Act was not applicable to an alien resident of the continental United States returning thereto from Puerto Rico.[2] The district judge held that there was no "entry" on March 30, 1951, within the meaning of the Act and ordered the discharge of appellee. The appeal is from that order.

Section 3 of the Act of 1917 provided that persons convicted of a crime involving moral turpitude should be excluded from admission into the United States. Section 1 provided:

"That the term 'United States' as used in the title as well as in the various sections of this Act shall be construed to mean the United States, and any waters, territory, or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone; *but if any alien shall leave the Canal Zone or any insular possession of the United States and attempt to enter any other place under the jurisdiction of the United States, nothing contained in this Act shall be construed as permitting him to enter under any other conditions than those applicable to all aliens.* \* \* \*" (Emphasis supplied.)

Appellant contends that under the plain wording of the quoted provisions appellee *left* Puerto Rico, an insular possession, and *came* to the mainland on March 30, 1951; that having been convicted of a crime involving moral turpitude prior to his entry at Miami on that date, he is clearly deportable and was legally in appellant's custody. Appellee contends that the provisions of the Act under which he is held must be construed in the light of their purpose; that the words "leave", "enter", "entry" and "come" must be interpreted in conformity with the context of the Act. The question, then, is whether or not appellee left the United States and re-entered it within the meaning of the Act.[3]

Ordinarily, statutory language should be construed in accordance with common usage, but the word "entry" has acquired a special meaning in judicial interpretation of immigration statutes.[4] Before there can be "entry" into the United States by a resident alien of the mainland, there must be a departure therefrom. To "leave" the alien must intentionally depart from the *United States;*[5] and to "enter" he must arrive from outside the United States, from a *foreign* port or place.[6]

By specific definition in Section 1, the term "United States" as used in the Act shall be construed to mean the mainland *and* any territory or place subject to its jurisdiction (except the Canal Zone). Certainly this definition includes Puerto Rico. Therefore, we conclude that appellee never "left" the

---

2. Other issues were briefed and argued, but the trial judge affirmatively ruled that "all of the other grounds for relief \* \* \* are not well founded"; and appellee did not appeal. In any event, the view we take makes unnecessary any discussion of the other issues.

3. This case arose prior to the enactment of the Immigration and Nationality Act of 1952, which appears to be specific in its definition of the word "entry". Section 101(a) (13); 66 Stat. 167; 8 U.S.C.A. § 1101(a) (13).

4. " \* \* \* the word has become a word of art." Gonzales v. Barber, 9 Cir., 207 F.2d 398, 402.

5. See Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17; United States ex rel. Volpe v. Smith, 289 U.S. 422, 426, 53 S.Ct. 665, 77 L.Ed. 1298; Yukio Chai v. Bonham, 9 Cir., 165 F.2d 207; DiPasquale v. Karnuth, 2 Cir., 158 F.2d 878. This court recently discussed "departure" and some of the cases cited here in Savoretti v. U. S. ex rel. Pincus, 5 Cir., 214 F.2d 314.

6. United States ex rel. Claussen v. Day, 279 U.S. 398, 401, 49 S.Ct. 354, 73 L. Ed. 758.

United States and did not "enter" the United States when he arrived at Miami on March 30, 1951. The word "come" in the portion of Section 19 quoted in footnote 1 can mean nothing in its context except "enter", and cannot be said to require a broader interpretation than intended in the body of the section of which it is a part. There being no entry within the meaning of the Act, appellee was not deportable under section 19 thereof, on the ground of having been convicted "prior to entry" of a crime involving moral turpitude.

This is the interpretation of the word "entry" announced by the Supreme Court on June 7, 1954, in Barber v. Gonzales, 347 U.S. 637, 74 S.Ct. 822, 825, affirming 207 F.2d 398. In that case a native of the Philippines who came to this country in 1930 (when those islands were possessions of the United States) was ordered deported "under § 19(a) of the Immigration Act of 1917 as an alien who 'after entry' had been sentenced more than once to imprisonment for terms of one year or more for crimes involving moral turpitude." The District Court dismissed a petition for habeas corpus, but the Court of Appeals for the Ninth Circuit reversed in an opinion which interprets the word "entry" as we do here, but which also seems to rest to some extent upon the fact that Gonzales was a *national* rather than an *alien*. On certiorari the Supreme Court concluded that there was no "entry", saying:

"At the time respondent came to the continental United States, he was *not arriving* 'from some *foreign* port or place.' On the contrary, he was a United States national moving from one of our insular possessions to the mainland. It was not until the 1934 Philippine Independence Act that the Philippines could be regarded as 'foreign' for immigration purposes. *Having made no 'entry,'* respondent is not deportable under § 19(a) as an alien who 'after entry' committed crimes involving moral turpitude." (Emphasis supplied.)

The appellant contends that the Gonzales case is not dispositive of the question presented to us for the reason that the decisions of both the Court of Appeals and the Supreme Court are predicated upon the finding that Gonzales was a *national* when he came to the mainland. There may be some basis for argument as to the premise underlying the opinion of the Court of Appeals, but we entertain no doubt that the Supreme Court's decision is based upon its interpretation of the word "entry". There the Government argued that Gonzales was an *alien* because of the provisions of Section 8(a)(1) of the Philippine Independence Act of 1934, 48 Stat. 456. The Supreme Court pretermitted this question, saying:

"The Government's argument is premised on the assumption that respondent made an 'entry' within the meaning of § 19(a). *If he did not make such an 'entry,' then he is not deportable* under that section, *even assuming* that the Government is *correct* in its broad construction of the 1934 Philippine Independence Act.*" 22 Law Week 4305. (Emphasis supplied.) See also footnote 4, 22 Law Week 4305.

Our appreciation of the import of the majority opinion is shared by the three Justices who dissented therefrom. Whatever may be the effect on this problem of the definition of "entry" in the Immigration and Nationality Act of 1952, we are confident that our interpretation of the 1917 Act is in accord with the latest Supreme Court decision and prior jurisprudence.

Appellant finally contends that this holding in effect judicially amends the italicized portion of Section 1 quoted above by adding thereto the proviso that it is applicable only to *resident* aliens of the Canal Zone and insular possessions. We think this argument is adequately answered in appellant's own brief, where he says: "Section 1 was undoubtedly aimed at preventing undesirable aliens from utilizing insular possessions as means of easy access to the mainland * * *." In refusing to

hold this provision applicable to an alien returning to his residence on the mainland after a visit to an insular possession, we are merely interpreting it in the light of its stated purpose.[7]

For the reasons assigned, the order of the lower court is

Affirmed.

---

7. "The necessity for the provision is the fact that aliens are using the insular territory (particularly the Philippines and Hawaii) as 'stepping-stones' to the continent." Senate Report 355, 63rd Congress, 2d Session.

"The second sentence (of section 1) is section 33, Act of 1907, amended so as to make it perfectly clear that the *admission* of an alien to the insular possessions does not privilege such alien to come to the mainland without examination. The necessity for the provision is the fact that aliens have been using the insular territory (particularly the Philippines) as a 'stepping-stone' to the continent, avoiding close inspection by first securing *admission* to the Philippines and then coming 'coastwise' to the United States proper." Senate Report 352, 64th Congress, 1st Session. (Emphasis supplied.)