NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0286n.06
Filed: April 16, 2009

No(s) 07-3353, 07-4468

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **GURMINDER SINGH**, aka Nick Singh, | ) | ON APPEAL FROM THE BOARD OF IMMIGRATION APPEALS |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| **ERIC H. HOLDER, JR.**, Attorney General | ) | |
| | ) | |
| *Respondent*. | ) | |

BEFORE:    BOGGS, Chief Judge; COLE and COOK, Circuit Judges.

**COLE, Circuit Judge.**  Petitioner Gurminder "Nick" Singh ("Singh") seeks review of a Board of Immigration Appeals ("BIA") order affirming an Immigration Judge's ("IJ") denial of cancellation of removal.  Singh also seeks review of the BIA's denial of his request to reopen for reconsideration, sua sponte, its prior decision in his case.  For the reasons discussed below, we **AFFIRM** the BIA's decisions, except with respect to its determination that Singh was convicted of a crime involving moral turpitude ("CIMT").  We **REMAND** for further consideration of that issue.

## I.  BACKGROUND

Singh was born in India on November 7, 1964 and entered the United States in 1985 without being admitted or paroled by an immigration officer.  On February 11, 1988, Singh's status was adjusted to temporary resident, and on July 6, 1992 his status was adjusted to lawful permanent resident, effective retroactively to December 1, 1990.  Singh initially lived in Los Angeles and

Fresno, California, where he worked several jobs, met his wife, and had two children.

In approximately 1997, Singh and his family relocated to Grand Rapids, Michigan. The family saved money and eventually, with the help of loans, purchased a liquor store, a home, a BP gas station, and interests in several other small properties and businesses. Singh and his wife operated the gas station and the liquor store. At the time of his removal proceedings, Singh estimated that he and his wife had $1 million in assets and owed $800,000 to $900,000 in mortgages and loans. In 2003, Singh helped his wife obtain lawful permanent resident status.

In 2004, Singh traveled to India for approximately one month to visit his parents and, on his return, applied for admission to the United States as a returning lawful permanent resident. Department of Homeland Security ("DHS") personnel determined Singh to be inadmissible for two reasons: first, he had been convicted of felonious assault with a dangerous weapon, in violation of section 750.82 of the Michigan Compiled Laws, which DHS identified as a CIMT, rendering him inadmissible under section 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(2)(A)(i)(I); and second, he did not possess a valid, unexpired immigrant visa, reentry permit, or other valid entry document, as required by INA section 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I). DHS served Singh with a Notice to Appear ("NTA") based on these two allegations and subsequently submitted an additional ground for removability—a 1997 conviction for attempted grand theft in violation of California Penal Code section 664/487(A).

Singh admitted the allegations in the NTA and initially conceded removability, and the IJ found that the charges of removability had been sustained by clear and convincing evidence (Singh's counsel later attempted to revoke the concession of removability and argue that Singh's crimes were

2

not CIMTs).  Singh sought a waiver under section 212(h)(1)(B) of the INA (section "212(h)"), 8 U.S.C. § 1182(h)(1)(B), which states that the Attorney General, in his discretion, may waive inadmissibility where denial of admission would result in extreme hardship to certain qualifying relatives of the alien.  8 U.S.C. § 1182(h)(1)(B).  The IJ interpreted section 212(h) to be available only to aliens applying for an adjustment of status, which Singh was not.  However, the IJ found Singh potentially eligible for discretionary relief through cancellation of removal under section 240A(a) of the INA, 8 U.S.C. § 1229b(a) ("section 240A").  Accordingly, the IJ held a hearing to determine whether Singh should be granted discretionary relief.

## A.    Singh's cancellation of removal hearing

Singh's hearing occurred over the course of two days with testimony from fourteen witnesses, including his wife, his fifteen-year-old son, his twelve-year-old daughter, members of his community and the Sikh temple to which he belonged, other family members, and other professional and personal acquaintances.  Singh's wife and children testified about the hardships they would face if Singh were removed.  They indicated a desire to remain in the United States but were unsure whether they would do so if Singh were removed.  The IJ found that Singh presented "a <u>substantial</u> amount of evidence (both documentary and testimonial) regarding his good deeds in the communities in which his businesses exist."  (Joint Appendix, Vol. 1, 113 (emphasis in original).)

Singh testified about his encounters with the law.  He was convicted of a misdemeanor offense in California in 1994 when, while working in a convenience store, he brandished a gun in front of several customers whom he believed to be threatening him.  He was ordered to pay a small fine.  In 1997, he was convicted of attempted grand theft in California for attempting to open a

3

checking account under a false name. He was sentenced to five years of probation. Also in 1997, Singh was convicted of felonious assault with a dangerous weapon in Michigan based on the following events: Singh and an acquaintance were arguing while driving in a pickup truck after an evening of consuming alcohol; they came to blows, and the acquaintance fell from the moving vehicle; Singh and his cousin, who was also in the truck, continued driving and left the acquaintance—the vehicle's owner—on the road. Singh was charged with kidnapping, car-jacking, and attempted murder but pleaded guilty to felonious assault with a dangerous weapon. The state-court record of his conviction states that two dangerous weapons were used in the assault—a car and a knife—but in his removal hearing Singh denied that a knife had been involved. He was placed on probation for five years and required to pay approximately $6000 in restitution, fines, and costs. Singh was also arrested twice in Michigan for driving while intoxicated.

In 2006, while Singh's removal proceedings were pending, he and his wife were arrested for receiving and concealing stolen property worth more than $1000 but less than $20,000. The charges were pending at the time of the hearing, and Singh asserted his Fifth Amendment privilege and elected not to testify about the circumstances of the arrest. The Government called one witness, a detective with the Grand Rapids police department, who testified about the investigation and stated that Singh was arrested for purchasing discounted merchandise, which Singh knew had been stolen from department stores such as Meijer and Target, and reselling it in his own stores.

**B.      The IJ's decision, the BIA's decision, and the motion to reopen**

The IJ decided, in her discretion, not to grant Singh cancellation of removal under section 240A. She found that Singh had an extensive criminal history that included assault and attempt to

defraud. She found that the evidence of recent criminal conduct by Singh weighed against a finding of rehabilitation. The IJ concluded that these negative factors outweighed Singh's contributions to his community and the adverse effects his removal would have on his family. Singh appealed to the BIA, which affirmed the IJ's denial of discretionary relief. The BIA also determined that Singh's Michigan conviction for assault with a dangerous weapon was a CIMT. Singh timely filed a petition for review in this Court on March 26, 2007.

On June 19, 2007, the BIA issued a decision in a case captioned *Matter of Abosi*, 24 I. & N. Dec. 204 (BIA 2007), which concluded, contrary to the IJ's decision in Singh's case, that a returning alien applying for admission is eligible to seek a section 212(h) waiver even if the alien is not concurrently seeking an adjustment in status. Accordingly, Singh filed a motion requesting that the BIA reopen his case. The BIA denied this motion as untimely and as not involving the type of exceptional circumstances required for sua sponte reopening. Singh petitioned this Court for review of the BIA's denial, and his two petitions were consolidated.

## II. ANALYSIS

A.      **Whether assault with a dangerous weapon under Michigan law is a CIMT**

An alien is inadmissible if he has been convicted of a CIMT. *See* INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I).[1] We generally accord *Chevron* deference to the BIA's decisions construing ambiguous statutory terms in the INA, and we must uphold the BIA's construction unless

---

[1] The question of whether Singh's crimes were CIMTs is properly before the Court: although Singh initially conceded removability, he revived his argument on this issue before the IJ, and the BIA squarely addressed it in disposing of the case on appeal.

it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984); *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006). However, we review de novo the BIA's interpretation of state criminal statutes in decisions regarding CIMTs. *See Wala v. Mukasey*, 511 F.3d 102, 105 (2d Cir. 2007); *Partyka v. Attorney Gen. of the United States*, 417 F.3d 408, 411 (3d Cir. 2005).

     1.      *Definition of "moral turpitude" and application to assault offenses*

The precise meaning of "'moral turpitude' . . . has never been fully settled," but it "refers generally to conduct that is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Matter of Torres-Varela*, 23 I. & N. Dec. 78, 83 (BIA 2001). "Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude." *See Matter of Ajami*, 22 I. & N. Dec. 949, 950 (BIA 1999). "Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind." *Id*. In assault crimes, a mens rea of intent is usually a requisite for deeming a crime a CIMT, although recklessness may suffice in the presence of certain aggravating factors. *See Matter of Fualaau*, 21 I. & N. Dec. 475, 477-78 (BIA 1996) (assault defined as recklessly causing bodily injury is not a CIMT); *Matter of Perez-Contreras*, 20 I. & N. Dec. 615, 619 (BIA 1992) (assault defined as negligently causing bodily harm is not a CIMT); *Matter of Medina*, 15 I. & N. Dec. 611, 614 (BIA 1976) (reckless assault with a deadly weapon is a CIMT). Simple assaults or batteries are generally not considered CIMTs because they require only general intent or only a minimal touching and no

injury. *See Matter of Sanudo*, 23 I. & N. Dec. 968, 972 (BIA 2006) (even though victim was spouse, domestic battery was not a CIMT because the statute required only minimal contact and no injury); *Matter of O---*, 3 I. & N. Dec. 193, 194 (BIA 1948) ("Simple assaults have generally been held not to involve moral turpitude.").

The BIA has held that aggravating factors may increase the morally turpitudinous nature of an assault to the point where it is considered a CIMT. One such factor is the use of a deadly or dangerous weapon in the commission of the assault. *See Medina*, 15 I. & N. Dec. at 614 (assault with a deadly weapon, whether knowing, intentional, or reckless, is a CIMT); *Matter of Ptasi*, 12 I. & N. Dec. 790, 791-92 (BIA 1968); *see also Sosa-Martinez v. Attorney Gen. of the United States*, 420 F.3d 1338, 1342 (11th Cir. 2005) (aggravated battery, consisting of simple battery plus the use of a deadly weapon, is a CIMT); *Niu v. INS*, No. 91-70336, 1992 U.S. App. LEXIS 12081, at *2 (9th Cir. May 19, 1992) (assault with a deadly weapon is a CIMT) (citing *Gonzales v. Barber*, 207 F.2d 398, 400 (9th Cir. 1953)). Additional aggravating factors include the infliction of physical harm and the victim's membership in a group entitled to special protection, such as children, domestic partners, or peace officers. *See Sanudo*, 23 I. & N. Dec. at 971; *see also Matter of Solon*, 24 I. & N. Dec. 239, 241 (BIA 2007) (assault "may or may not involve moral turpitude," and "the presence of an aggravating factor can be important in determining whether a particular assault amounts to a crime involving moral turpitude").

In assessing the use of a weapon as an aggravating factor, past decisions of the BIA have used the terms "deadly weapon" and "dangerous weapon" in tandem without suggesting that the difference between the two is analytically significant, although the BIA has not explicitly held that

the distinction does not affect CIMT analysis. *See Ptasi*, 12 I. & N. Dec. at 791 (assault with a dangerous or deadly weapon is a CIMT); *O---*, 3 I. & N. Dec. at 197 ("[A]n assault aggravated by the use of a dangerous or deadly weapon is contrary to accepted standards of morality in a civilized society.").

In determining whether a crime is a CIMT,

> we must first examine the statute itself to determine whether the inherent nature of the crime involves moral turpitude. If the statute defines a crime in which moral turpitude necessarily inheres, then the conviction is for a crime involving moral turpitude for immigration purposes, and our analysis ends. However, if the statute contains some offenses which involve moral turpitude and others which do not, it is to be treated as a "divisible" statute, and we look to the record of conviction, meaning the indictment, plea, verdict, and sentence, to determine the offense of which the respondent was convicted.

*See Ajami*, 22 I. & N. Dec. at 950; *see also Jaadan v. Gonzales*, 211 F. App'x 422, 426-27 (6th Cir. 2006).

### 2. *The relevant statute*

The crime of which Singh was convicted is defined by statute as follows:

> a person who assaults another person with a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon without intending to commit murder or to inflict great bodily harm less than murder is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both.

Mich. Comp. Laws § 750.82. The elements of this crime, as interpreted by Michigan courts, are: (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable fear or apprehension of an immediate battery. *People v. Lawton*, 492 N.W.2d 810, 815 (Mich. Ct. App. 1992). Michigan courts have described a "dangerous weapon" as an instrument capable of causing serious bodily injury. *See People v. Kay*, 328 N.W.2d 424, 426 (Mich. Ct. App.

1982). "[I]t is the manner in which an instrumentality is used and the nature of the act which determines whether an instrumentality is 'dangerous.'" *See People v. Ruffin*, No. 217347, 2001 Mich. App. LEXIS 708, at *6 (Mich. Ct. App. Jan. 9, 2001). The statute requires one of two unlawful intents: either an intent to injure (i.e., an attempted battery) or an intent to place the victim in apprehension of an immediate battery. In *People v. Reeves*, 580 N.W.2d 433, 436-37 (Mich. 1998), the Michigan Supreme Court explained that these two types of assault have different mental elements, noting that, at early common law, only the attempted-battery variety of assault was criminalized.

### 3.  *Michigan's statute is potentially divisible*

We have previously stated in two unpublished opinions that felonious assault with a dangerous weapon under Michigan law is a crime of moral turpitude, although in neither case did we perform an in-depth analysis of the question. *See Atoui v. Ashcroft*, 107 F. App'x 591, 593 (6th Cir. 2004) ("To the extent that Atoui is challenging [it] . . ., the IJ did not abuse his discretion in concluding that felonious assault with a dangerous weapon is a crime of moral turpitude."); *Jaadan*, 211 F. App'x at 428 ("Jaadan does not challenge the BIA's conclusion . . . that felonious assault [is a CIMT, but as] the BIA noted, assaults involving the use of a weapon are [CIMTs]."). The BIA's unpublished decision in this case found the crime to be a CIMT, reasoning that assault with a deadly weapon has clearly been established as a CIMT, *see Medina*, 15 I. & N. Dec. at 614; *Ptasi*, 12 I. & N. Dec. at 791, and there is not "an appreciable difference between assaulting someone with a deadly weapon as opposed to one that is . . . dangerous . . . such that one involves moral turpitude and the other does not." (JA 63). The BIA also cited a Fourth Circuit decision that concluded that assault

with a dangerous weapon is a CIMT. *See Yousefi v. INS*, 260 F.3d 318, 326-27 (4th Cir. 2001) (interpreting a District of Columbia statute essentially the same as the one at issue in this case).

Because the Michigan statute essentially encompasses two distinct offenses—assault with intent to harm, and assault with intent merely to cause apprehension of harm—we must determine whether both constitute CIMTs. *Cf. Perez v. Mukasey*, 512 F.3d 1222, 1225-26 (9th Cir. 2008) (finding assault statute divisible for purposes of whether it was a "crime of violence" because statute included attempted-battery-variety of assault, apprehension-variety of assault, and non-consensual offensive touching). The BIA's decision in this case did not address this question, nor has the BIA squarely addressed it in any of its published opinions dealing with whether assault crimes are CIMTs. One opinion (from over fifty years ago) suggests that the BIA would classify an apprehension-variety assault with a dangerous weapon as a CIMT. *See O---*, 3 I. & N. Dec. at 197 (holding that an assault with a dangerous or deadly weapon is a CIMT even when the statute lacks a requirement of specific intent to inflict bodily harm).

Reliance on BIA opinions analyzing "assault" requires careful attention, as different states define "assault" differently, and assault, which does not require any physical contact under the Michigan statute, should not be conflated with the more serious offense of assault and battery. For example, under New York law, assault crimes generally include physical contact as an element, and the offense equivalent to the apprehension-variety assault in the Michigan felonious assault statute is called "menacing in the second degree." *See* N.Y. Penal Law § 120.14; *see also Solon*, 24 I. & N. Dec. at 244 n.5 (noting that "some of the lesser conduct traditionally encompassed within common-law assault" is codified as crimes other than assault under current New York law). The

BIA appears never to have considered whether "menacing" with a dangerous weapon is a CIMT. In an unpublished opinion, the Third Circuit found "menacing in the second degree" under the New York statute to be a CIMT because "[o]ther courts and the BIA have found offenses that involve intentionally placing an individual in fear of physical injury to be morally turpitudinous." *See Campbell v. Attorney Gen. of the United States*, 174 F. App'x 89, 90 (3d Cir. 2006). However, the three cases the *Campbell* court cited do not provide particularly strong support for this proposition, as they involve considerably different types of crimes. *Id*. at 91 (*citing Chanmouny v. Ashcroft*, 376 F.3d 810, 813-15 (8th Cir. 2004); *Ramirez v. Ashcroft*, 361 F. Supp. 2d 650, 659 (S.D. Tex. 2005); *Ajami*, 22 I. & N. Dec. at 951).

The apprehension variety of assault is less morally turpitudinous than the attempted-battery variety, as it requires no intention to physically harm another person. This is apparent from a simple example: Under the Michigan statute, holding a baseball bat as if to strike someone with it (with the intention of placing that person in fear of being struck by the bat), and actually swinging the bat in a failed attempt to strike the person both satisfy the statute, but the latter is clearly more "inherently base, vile, or depraved, and contrary to the accepted rules of morality," *Torres-Varela*, 23 I. & N. Dec. at 83, than the former. We can imagine a range of factual circumstances that would fall within the apprehension-portion of the statute but would plainly stretch the concept of a CIMT. However, since the BIA has not considered this distinction, we will remand the case for further consideration. *Cf*. *Garcia-Meza v. Mukasey*, 516 F.3d 535, 537-38 (7th Cir. 2008) (remanding for reconsideration where BIA mistakenly read a bodily-injury requirement into a state assault statute). If the BIA ultimately determines that Singh's assault conviction under the particular Michigan statute is not a

CIMT, then the BIA must proceed to determine whether Singh's 1997 attempted-grand-theft conviction in California qualifies as a CIMT.

**B.      Denial of cancellation of removal**

Cancellation of removal under section 240A is a discretionary remedy that is not reviewable by courts, with the exception that we review legal or constitutional questions de novo. *See* 8 U.S.C. § 1252(a)(2)(B)(i), (D); *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 502 (6th Cir. 2008). Singh challenges the IJ's decision on two constitutional grounds.

Singh claims that his Fifth Amendment rights were violated when the IJ drew "unsupported" adverse inferences from his silence with respect to his 2006 arrest for receiving and concealing stolen property. Singh does not dispute that adverse inferences may be drawn from an alien's silence in a deportation hearing, *see Mansour v. INS*, 1994 U.S. App. LEXIS 9203, at *8-9 (6th Cir. Apr. 25, 1994) (per curiam); *Matter of O–*, 6 I. & N. Dec. 246, 248 (BIA 1954), but claims that the IJ's inferences were unreasonable. This claim is unsupported by the record, which shows that the IJ was well-aware that Singh had only been arrested for, and not convicted of, receiving and concealing stolen goods. Furthermore, the IJ was clearly concerned about the quality of the evidence pertaining to this arrest, as she ruled on several objections based on the reliability of the detective's statements and sustained at least one of them.

Singh cites *Matter of Tsang*, 14 I. & N. Dec. 294 (BIA 1973), for the proposition that adverse action may not be taken against an alien for invoking his Fifth Amendment privilege. In *Tsang*, the IJ retaliated against the alien for invoking the privilege, stating that because the alien had made the Government's task more difficult by remaining silent the IJ would not consider the alien for

discretionary relief. *Tsang*, 14 I. & N. Dec. at 295. Here, there is no indication that the IJ denied Singh relief *because* he invoked the privilege, so *Tsang* does not apply.

Singh also claims that he was denied due process as a result of various errors by the IJ, but the record belies this claim, showing that Singh received a full, fair hearing. *See Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (stating that the Fifth Amendment entitles aliens in deportation hearings to a full and fair hearing). Singh claims the IJ's determination that he was ineligible to seek a section 212(h) waiver denied him due process. Singh failed to raise this claim before the BIA, so it is not preserved for appeal. *See Khalili v. Holder*, No. 08-3296, 2009 U.S. App. LEXIS 4023, at *7 (6th Cir. Feb. 27, 2009); 8 U.S.C. § 1252(d)(1).

## C.      Eligibility for a section 212(h) waiver

In his Statement of Reasons for Appeal in his Notice of Appeal to the BIA, Singh did not challenge the IJ's determination that he was ineligible to seek a section 212(h) waiver. Nor did the BIA rule on this issue. We do not have jurisdiction to review claims in an appeal from a final order of removal unless they were raised before the BIA. *Khalili*, 2009 U.S. App. LEXIS 4023, at *7; 8 U.S.C. § 1252(d)(1).

## D.      Denial of request to reopen

Singh sought sua sponte reopening based on the BIA's recent decision in *Matter of Abosi*, 24 I. & N. Dec. 204, which holds that aliens deemed inadmissible are eligible to seek a section 212(h) waiver independent of an application for a change in status. We generally review a denial by the BIA of a motion to reopen for abuse of discretion, *see INS v. Doherty*, 502 U.S. 314, 323 (1992), but because Singh's motion was untimely, the BIA had unfettered discretion over whether

or not to grant his request. *See Harchenko v. INS*, 379 F.3d 405, 410 (6th Cir. 2004); 8 C.F.R. § 1003.2(a). Sua sponte reopening is "an extraordinary remedy reserved for truly exceptional situations." *Matter of G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999). In particular, the BIA noted that Singh had not acted diligently because more than ninety days elapsed between its decision in *Abosi* and Singh's motion to reopen. We lack jurisdiction to review the BIA's decision not to invoke sua sponte its authority to reopen Singh's case. *See Harchenko*, 379 F.3d at 410-11.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the BIA's decisions denying Singh cancellation of removal and denying his motion to reopen proceedings. We **REMAND** for further consideration of whether Singh was convicted of a CIMT.