Celso LOPEZ LOPEZ,
Plaintiff, Appellant,

v.

M. ARAN, et al., Defendants, Appellees.

No. 86–1974.

United States Court of Appeals,
First Circuit.

Heard May 6, 1987.

Decided April 25, 1988.

Rehearing and Rehearing In Banc
Denied July 21, 1988.

Judith Berkan with whom Charles S. Hey–Maestre, Jose Antonio Lugo and William Santiago–Sastre, Santurce, P.R., were on brief, for plaintiff, appellant.

Celso Lopez, Lopez, pro se, San Sebastian, P.R.

Eduardo E. Toro Font, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for defendants, appellees.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This case requires us to probe the constitutional implications associated with checkpoints established by the federal Immigration and Naturalization Service (INS) at the airport in Isla Verde, Puerto Rico. Such checkpoints are used for preliminary screening of persons attempting to board domestic flights between Puerto Rico and the continental United States.[1] The appeal demands that we assess important fourth amendment values in determining whether —and if so, to what extent—the INS's set procedure is a permissible encounter of the kind sanctioned by the Supreme Court in *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), or is some other (less acceptable) breed of cat.

I

The facts relevant to these issues are set forth in the opinion of the district court, *see Lopez v. Aran*, 649 F.Supp. 853, 856–58 & nn. 4–9 (D.P.R.1986), and we refer the reader with a penchant for nice detail to that meticulous rescript. We rehearse only those facts which we deem helpful to an understanding of the issues before us.

We start by recounting an affray which occurred on July 16, 1982—an affray which served as a telling prelude to the main

---

1. *See* 8 C.F.R. § 235.5(a) (1986):

In the case of any aircraft proceeding from ... Puerto Rico ... destined directly and without touching at a foreign port or place ... to one of the States of the United States or the District of Columbia, the examination required by the act of the passengers and crew may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure.... When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he is found to be admissible as provided in this section.

incident involved in this suit.[2] Appellant, Celso Lopez Lopez (Lopez), a United States citizen resident in Puerto Rico and a lawyer experienced in immigration matters, proposed to take a Capitol Airlines domestic flight from San Juan to New York City. During the pre-boarding inspection, an INS inspector, defendant Moreno, confiscated Lopez's ticket and inquired about his citizenship. Instead of answering, appellant produced a prepared card emblazoned with the legend: "Do you suspect I am an alien?" The inspector did not swallow the bait, but went about her inspection of other prospective passengers. When Lopez asked her if he would be allowed to board the aircraft, the inspector responded affirmatively, stating that she knew from appellant's accent that Lopez was Puerto Rican (and thus, a citizen of the United States). Appellant's ticket was returned and he departed on schedule.

Lopez, however, had no intention of letting sleeping dogs lie. On October 2, 1982, he approached a departure gate intending to board an Eastern Airlines flight bound for Washington. Two INS inspectors, defendants Aran and Figueroa, were conducting preflight inspections of prospective passengers at a spot near the gate, immediately in front of the fixed security checkpoint. As appellant passed them, Figueroa made inquiry as to his citizenship. Lopez smiled, but did not reply. He proceeded past the agents and placed his luggage on the conveyor belt at the security station. Both inspectors followed him, and Figueroa repeated the query. Lopez did not respond verbally but instead presented his antagonists with the same sort of preprinted card which he had used on the earlier occasion. Apparently desirous of testing the point, and mindful that his accent might betray his origins, appellant remained mute while Figueroa continued to press him for an answer. The conveyor belt was deactivated, so that appellant's luggage could not traverse it. Then, Lopez attempted to pass through the departure gate. He was impeded from doing so by a security guard.

When this happened, Lopez sought out an Eastern Airlines supervisor, who helped him retrieve his suitcases but was otherwise of little solace. He thereafter left the area, having neither answered the questions nor boarded the flight.

The stage was set. Lopez proceeded to file an action in the federal district court challenging the validity of the stop, interrogation, and related procedures. He named as defendants, *inter alia*, the inspectors who had barred his way (Moreno, Aran, and Figueroa), and various officials of the INS. Other defendants—including Eastern Airlines and a private firm which provided security services at the airport on a contract basis—were originally sued, but later voluntarily dismissed. The suit requested a "declaratory judgment that the policies, practices and acts complained of" were illegal and unconstitutional, the issuance of a permanent injunction preventing the various INS officials "from questioning or detaining [appellant] when he travels between Puerto Rico and the United States mainland", money damages, and ancillary relief.

Before the case was tried, several changes took place in the operation of the INS checkpoints at Isla Verde. From no later than April 1985, the checkpoint corresponding to the one involved in the October 1982 affair was relocated to a spot *beyond* the security station. A podium was placed "clearly marked at eye-level with bold white letters on a black background announcing 'U.S. IMMIGRATION', and bearing on its front side a large, visible, official color seal of the United States of America." *Lopez v. Aran*, 649 F.Supp. at 856. Thereafter, the INS agents conducted the inspections either from behind the podium or in close proximity thereto. *Id.* at 856–57. As before, they continued to wear distinctive uniforms and badges. *Id.* at 857. The operational instructions stayed essentially the same: inspectors were told to examine every adult passenger and to take physical possession of an interviewee's airline ticket

---

**2.** Although the appellant's complaint originally hinted at two earlier episodes (one in 1979 and one in 1980), the district court dismissed those allegations for want of specificity. 649 F.Supp. at 855. That determination has not been questioned on appeal.

while questioning him or her. *Id.* In actual practice, however, not every passenger was screened and not every ticket was taken. *Id.*

Most of appellant's contentions are centered around 8 C.F.R. § 235.5, *see supra* n. 1, and the statute from which it prescinds, 8 U.S.C. § 1182(d)(7) (1982).[3] We need not spell out all of his assertions in detail; to the extent not discussed, they should simply be deemed rejected. It suffices to say that appellant's main challenges to the statute and the regulation label them as being unconstitutionally vague, infringing upon constitutionally-protected travel rights, and permitting searches and seizures violative of the fourth amendment. Lopez also claims that promulgation of the regulation was beyond the lawful power of the INS and that the rule has been (mis)applied in a discriminatory fashion. We turn now to his principal asseverations.

## II

■ The district court rebuffed appellant's vagueness argument, ruling that both 8 U.S.C. § 1182(d)(7) and 8 C.F.R. § 235.5 gave adequate notice to all persons leaving Puerto Rico, bound for the mainland United States, that they might be required to explain their immigration status. We agree.

The "void for vagueness" doctrine is essentially a due process concept. It applies to persons in Puerto Rico. *See generally Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). The doctrine's chief application is in respect to criminal legislation. *E.g., Jordan v. De George,* 341 U.S. 223, 230, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951); *cf. Zwickler v. Koota,* 389 U.S. 241, 249–50, 88 S.Ct. 391, 396–97, 19 L.Ed.2d 444 (1967)

(distinguishing void for vagueness doctrine from overbreadth). *See also* Amsterdam, *The Void for Vagueness Doctrine in the Supreme Court,* 109 U. of Pa.L.Rev. 67 (1960). Thus, the principle is of doubtful application to the present circumstances. Here, rather than government purporting to proscribe an individual's conduct, the individual is informed of conduct to be undertaken by the government. But we need not rest our holding on this structural point. If we were to assume *arguendo* that the void for vagueness doctrine could be extended in the fashion envisioned by Lopez, the district court's conclusion would nevertheless—and quite easily, we think—pass muster.

Both the statute and the regulation clearly afford notice to a person of ordinary intelligence of the action that is to take place, and of what is expected of the public. *See Buckley v. Valeo,* 424 U.S. 1, 77, 96 S.Ct. 612, 662, 46 L.Ed.2d 659 (1976) (per curiam). By virtue of these enactments, all persons leaving Puerto Rico for the mainland should be on fair notice that they may be subjected to pre-boarding examinations in order to ascertain their status within the United States. Whether or not this is a lawful procedure is, perhaps, a horse of another hue—but there is certainly nothing impermissibly vague or entropic about the regulatory mosaic.

## III

■ Appellant's assault on 8 C.F.R. § 235.5 as being *ultra vires* and as being promulgated with discriminatory intent is a confusing farrago of partially-formed ideas. Lopez's argument, we assume, must be that the regulation is unauthorized because it treats the travel of citizens and resident aliens[4] from Puerto Rico to the

---

**3.** The statute reads in pertinent part as follows: The provisions of subsection (a) of this section [classes of aliens excludable] ... shall be applicable to any alien who shall leave Puerto Rico ... and who seeks to enter the continental United States.... Any alien described in this paragraph, who is excluded from admission to the United States, shall be immediately deported in the manner provided by section 1227(a) of this title.

8 U.S.C. § 1182(d)(7) (1982).

**4.** Appellant, of course, is a citizen. He has no standing to claim the rights of persons who are resident aliens, or to champion their claims for them. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (generally, party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

United States as "entries" into the United States. The district court ruled that, in enacting 8 U.S.C. § 1182(d)(7), Congress provided "a specific exception to the definition of 'entry' for purposes of establishing a secondary border at which to exclude particular classes of excludable aliens." *Lopez v. Aran,* 649 F.Supp. at 862. It reasoned that unless a person was excludable under § 1182(d)(7), the mere fact that he or she travelled between Puerto Rico and the continental United States would not constitute an "entry." *Id.* Continuing this rationale, the district court suggested that 8 C.F.R. § 235.5 was in effect an extension of § 1182(d)(7). *Id.* at 862–63. Thus, rather than comprising an usurpation of undelegated authority, the regulation was a proper implementation of the enabling statute. *Id.*

We agree with these conclusions, although we express reservations concerning the district court's statements as to the existence, in any sense, of a "secondary border" (whatever that term might mean) between Puerto Rico and the United States. *See Torres v. Puerto Rico,* 442 U.S. 465, 472–74, 99 S.Ct. 2425, 2430–31, 61 L.Ed.2d 1 (1979) (no "intermediate border" between Puerto Rico and United States for fourth amendment purposes). *See also Savoretti v. Voiler,* 214 F.2d 425, 427–28 (5th Cir. 1954) (no "entry" in the immigration sense when resident alien returns to continental United States from Puerto Rico); 8 U.S.C. § 1101(36) (1982) (Puerto Rico is within the United States for immigration purposes); 8 U.S.C. § 1101(38) (1982) (similar). Be that as it may, the present circumstances do not require us to dwell overlong on this issue. Congress has plainly authorized the establishment of checkpoints *within* the United States for the purpose of stopping and interrogating passersby as to their immigration status. The district court held that

locating such a checkpoint at the Isla Verde airport was a reasonable exercise of this authority. *Lopez v. Aran,* 649 F.Supp. at 863. Whether that is a constitutionally valid procedure is a distinctly separate question from deciding whether the regulation was *ultra vires* —which, in our view, was not the case. On much the same analysis, the exhortation that the regulation was discriminatorily applied must also be rejected. Given the reasonableness of INS's siting decision, nothing more need be said on the subject.

For these reasons, we hold that the checkpoint of which Lopez ran afoul was established under due authority. The promulgation of the regulation in question was not *ultra vires,* nor was the rule implemented in a discriminatory fashion.[5]

IV

Appellant's most forceful challenge is based on the alleged violations of the fourth amendment and of the right to travel. The former is a classic repository of fundamental constitutional rights, *Torres v. Puerto Rico,* 442 U.S. at 471, 99 S.Ct. at 2429, and the right to travel is similarly endowed. *Id.* at 470, 99 S.Ct. 2429. *See Califano v. Torres,* 435 U.S. 1, 4 n. 6, 98 S.Ct. 906, 908 n. 6, 55 L.Ed.2d 65 (1978) (per curiam); *Balzac v. Porto Rico,* 258 U.S. 298, 308, 42 S.Ct. 343, 347, 66 L.Ed. 627 (1922). We have no hesitancy in ruling that such rights are fully applicable in Puerto Rico. Thus, the constitutional parameters of our inquiry are unaffected by the geography of the case.

Our consideration of appellant's substantive asseveration must flow from the Supreme Court's decision in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).[6] There, the

---

**5.** Lopez's equal protection challenge to the statute and regulation is altogether unavailing. We rebuff it for substantially the reasons stated below. *Lopez v. Aran,* 649 F.Supp. at 864–65.

**6.** We acknowledge that there are earlier "border" cases of arguable relevance to the case at bar. *E.g., United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (invalidating full-scale searches at traffic checkpoint on inter-

state highway sixty-six miles from Mexican border for want of probable cause); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (upholding stop and interrogation by roving patrol near Mexican border where reasonable suspicion exists); *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (condemning warrantless search of vehicle by roving patrol near

Court approved the use of fixed automobile checkpoints for the purpose of stopping traffic to inquire regarding the occupants' immigration status. *Martinez–Fuerte* involved two checkpoints. At the California checkpoint, a "point" agent visually screened all northbound traffic at a stop sign, causing all vehicles to come "to a virtual, if not complete, halt." *Id.* at 546, 96 S.Ct. at 3078 (footnote omitted). As the Court described it, "[m]ost motorists [were] allowed to resume their progress without any oral inquiry or close visual examination. In a relatively small number of cases the 'point' agent [would] conclude that further inquiry [was] in order." *Id.* Once that conclusion was drawn, he would direct the cars involved "to a secondary inspection area, where the[ ] occupants [were] asked about their citizenship and immigration status." *Id.* The average length of this secondary inspection was three to five minutes. The decision to stop particular vehicles for secondary inspection was not necessarily based on any articulable suspicion. *Id.* at 547, 96 S.Ct. at 3078. The second checkpoint was located near Sarita, Texas, close to ninety miles from the Mexican border. Its set-up generally resembled the California checkpoint and much the same protocol was employed (except that *all* northbound motorists, other than persons recognizable by the agents as local citizenry, were customarily stopped for brief inquiry). *Id.* at 550, 96 S.Ct. at 3079.

In validating these checkpoints in the face of a fourth amendment protest, the Court emphasized the relative effectiveness of traffic-monitoring operations in apprehending deportable aliens as compared with other methods in place along the border between Mexico and the United States. *Id.* at 552–53, 96 S.Ct. at 3080–81. Acknowledging "that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment," *id.* at 556, 96 S.Ct. at 3082, the Court employed a prudential balancing test. *Id.* Noting that "the need to make routine checkpoint stops [was] great," the Court found the "consequent intrusion on

Fourth Amendment interests [to be] quite limited." *Id.* at 557, 96 S.Ct. at 3083. In approving the INS's procedure, the *Martinez–Fuerte* Court pointed out that the degree of subjective intrusion was near its nadir in a checkpoint stop (as opposed to, say, a roving patrol) because (1) potential interference with legitimate traffic was minimal, (2) approaching motorists were not taken by surprise, and (3) the regimen used was less discretionary in nature in that neither the location of the checkpoint nor the agents' method of operation was ad-libbed by officers in the field. *Id.* at 558–59, 96 S.Ct. at 3083. The Court also held that "even if it be assumed that [secondary inspection] referrals are made largely on the basis of apparent Mexican ancestry, we perceive no constitutional violation." *Id.* at 563, 96 S.Ct. at 3085 (footnote omitted).

Our discussion in this area of the law would, we fear, be incomplete without reference at this point to *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). *Royer* involved the stop and interrogation by plainclothes detectives of an individual, Royer, who fit the so-called "drug courier profile," an abstract of characteristics thought by law enforcers to be typical of persons transporting illegal narcotics. He was halted at the concourse leading to the boarding area at Miami International Airport as he was about to take a flight to New York City. Upon request, Royer produced (and handed over) his airline ticket and driver's license. The latter correctly identified him, but the ticket and his baggage identification tags reflected an entirely different name. When asked to explain the discrepancy, he became "noticeably more nervous." *Id.* at 494, 103 S.Ct. at 1322. Spotting this, the detectives identified themselves as narcotics investigators and asked Royer to accompany them to a nearby room for further questioning. They did not return his airline ticket or his identification, or inform him that he was free to leave. He was thereafter interroga-

---

Mexican border). Yet in our view, all things considered, *Martinez–Fuerte* is our most logical

starting point.

ted and, without his consent, his baggage was retrieved. He was then asked to authorize a search of the bags; he responded by unlocking one suitcase. When opened, marijuana was found. Predictably, Royer was arrested. Approximately fifteen minutes elapsed between the initial stop and the arrest.

In affirming suppression of the evidence as fruit of an illegal search, the Court stated explicitly that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him if the person is willing to listen...." *Id.* at 497, 103 S.Ct. at 1324. The Court went on to observe, however, that such an individual "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Id.* at 498, 103 S.Ct. at 1324 (citation omitted). Given the justifiable governmental interest in halting the movement of illicit drugs, "[a]sking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves...." *Id.* at 501, 103 S.Ct. at 1326. It was what took place thereafter, including "retaining his ticket and driver's license ... without indicating in any way that he was free to depart," *id.*, that went beyond a mere *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1967), and thus required probable cause. That *Royer* leaves some workable latitude for law enforcement personnel has been made manifest by the Court's subsequent discussions of it. *See, e.g., Florida v. Rodriguez,* 469 U.S. 1, 5–7, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam).

The final case which we will mention at this juncture is *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Acting pursuant to warrants, the INS conducted "factory surveys" in search of illegal aliens. The surveys lasted one to two

hours each, with some agents posted at the exits while others moved through the shop. Except during one's own interrogation, the employees continued to work and remained free to stroll around the factory. The inspectors canvassed the entire workforce. After identifying themselves, they asked each person one to three preliminary questions regarding citizenship. If an interviewee responded in a fashion which the agents deemed credible, they would move on. If suspicion was engendered during the initial inquiries, however, a secondary interrogation would result.

Several employees who were citizens or permanent resident aliens challenged the validity of these procedures as anathematic to the fourth amendment. The Court rejected the notion that stationing agents at the factory doors constituted a seizure, and held that the INS could question individual employees notwithstanding the lack of any (particularized) suspicion that the person to be grilled was in fact an illegal alien. The Court ruled that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure," *id.* at 216, 104 S.Ct. at 1762, so long as the individual's response is voluntary. The Court cautioned, however, that if lawmen take additional steps to secure an answer in the face of a refusal to respond, "then the Fourth Amendment imposes some minimal level of objective justification [as a prerequisite] to validate the detention or seizure." *Id.* at 216–17, 104 S.Ct. at 1763. The encounters at issue in *Delgado* were held not to offend the fourth amendment. *Id.* at 221, 104 S.Ct. at 1765.

We synthesize these cases in manner following. Although the fourth amendment protects individuals irrespective of where they may be, not all brushes between a citizen and the sovereign call into play the jurisprudence of the Constitution. In the structured context of, say, an airline departure gate, the government's right to check citizenship, it seems to us, is stronger than its right to probe identity in completely fortuitous, random situations. Especially where the encounter is brief and

noncoercive—that is, if the stop and interrogation involve no more than a modest intrusion—there need be no particularized suspicion. *Cf. United States v. Villamonte–Marquez*, 462 U.S. 579, 592, 103 S.Ct. 2573, 2581, 77 L.Ed.2d 22 (1983) (random stops of vessels allowable which "involve[ ] only a brief detention where officials ... board, visit public areas ... and inspect documents"). But, where the stop and 'interrogation comprise more of an intrusion, and the government seeks to act on less than probable cause, a balancing test must be applied. The touchstone, of course, is reasonableness.

To calibrate these scales, judges must weigh the need to search or seize against the invasion the search or seizure entails. This calibration is perhaps best described in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). There, the Court invalidated the application of a Texas statute which criminalized failure to comply with a policeman's demand that an individual identify himself. Police officers had observed appellant in an area noted for a high incidence of drug traffic, in circumstances which "looked suspicious." *Id.* at 49, 99 S.Ct. at 2639. Yet, the arresting officers admitted that they did not suspect Brown of any specific misconduct. *Id.* When asked to identify himself by the police, he refused. The Court, in discussing the type of balancing test to be applied, indicated that its components were "[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty." *Id.* at 51, 99 S.Ct. at 2640. Absent reasonable suspicion, the *Brown* Court indicated that attention must perforce be drawn to whether the "seizure" was left to the discretion or whim of an officer in the field, or alternatively, upon "a plan embodying explicit, neutral limita-

tions on the conduct of individual officers." *Id.* Such a search for equipoise has strong and deep roots in the jurisprudence of the fourth amendment. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879; *Camara v. Municipal Court*, 387 U.S. 523, 534–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). It is precisely this sort of libration which must be sought in respect to Lopez's constitutional challenge.

The INS protocol (to which appellant was exposed at least twice in 1982) can be bifurcated for analytic purposes. First, we consider the initial inspection and questioning, followed by a stop for secondary inspection—mindful that, insofar as the record of this case indicates, such a secondary inspection occurs only if the level of suspicion escalates.[7] Second, we address the INS's policy calling for seizure of passengers' tickets while questioning is taking place.

## V

■ A. *Inspection.* All in all, we find the comparison between the airport checkpoint at Isla Verde and the *Martinez–Fuerte* vehicular checkpoint to be a compelling one. Although a greater intrusion took place here, the basic procedure—the "checkpoint stop"—is itself strikingly similar. Nevertheless, we acknowledge that ascertainment of the likenesses between these kissing cousins, though it eases our inquiry, does not end it. Checkpoint stops are indubitably "seizures" within the meaning of the fourth amendment, *see Martinez–Fuerte*, 428 U.S. at 556, 96 S.Ct. at 3082, so the facts of each case, including this one, must be analyzed to see if the precise scenario passes fourth amendment muster.[8]

7. This initial phase can itself be seen as comprising two segments. The posing of the question to a perambulating prospective passenger can conceptually be separated from the continued pressing of the inquiry after the person passes the officer without responding. But the second segment is merely a (reasonable) way of making sure that the traveller has heard and understood the query, but is nevertheless deliberately refusing to answer. Inasmuch as neither of these segments requires articulable suspicion, they can be treated as one for purposes of our analysis.

8. We do not mean to imply, of course, that *consensual* checkpoint encounters implicate the fourth amendment, for in our judgment they do not. *See Florida v. Rodriguez*, 469 U.S. at 5–6,

At the expense of possible redundancy, we reiterate some of the key facts. INS agents at the Isla Verde International Airport conduct an initial inspection to determine the immigration status of prospective passengers by asking them about their citizenship. The question is usually posed, as we understand it, while the subject is walking toward the departure gate. He or she need not halt—nor necessarily slow down—in order to respond. When a traveller affirms that he or she is a citizen of the United States, and no further suspicion is aroused, the questioning stops and the individual remains free to proceed. On the other hand, if an agent comes to suspect that the traveller is an alien (or if the legality of the person's immigration status cannot readily be determined), then the individual is referred to secondary inspection. In that phase of the inquiry, the INS officer takes the passenger to another section of the airport for further interrogation.

In *Martinez–Fuerte,* the Supreme Court held that the stop and questioning there at issue could "be made in the absence of any individualized suspicion at reasonably located checkpoints." 428 U.S. at 562, 96 S.Ct. at 3085 (footnote omitted). The precise procedure included a nearly complete halting of automobile traffic as vehicles passed the checkpoint, visual screening of cars and occupants, and (in a relatively small number of cases) referral of vehicles to a secondary inspection area where the occupants were queried about their citizenship and immigration status. *Id.* at 546, 96 S.Ct. at 3077. The basic protocol employed at Isla Verde is quite similar, given the differences between travel by air and travel by automobile—so much so that *Mar-*

*tinez–Fuerte* establishes the constitutionality of these procedures. We briefly review the extent of the parallel.

In both instances, the inspections occur at fixed, plausibly located checkpoints, the existence of which, arguably at least, was "practically necessary to control the flow of persons" onto the mainland. *United States v. Garcia,* 672 F.2d 1349, 1362 (11th Cir.1982). In both instances, the public interest justifying the questioning is legitimate and important. Indeed, it is exactly the same here as in *Martinez–Fuerte:* the need to interdict the flow of illegal aliens into the mainland United States. 428 U.S. at 551–53, 96 S.Ct. at 3080–81. Significant numbers of illegal aliens have been apprehended as a result of INS inspections at Isla Verde. The record shows that the INS, through the instrumentality of checkpoint stops, uncovered the following number of outward-bound passengers found to be in violation of the law: 1982—1710 passengers; 1983—1030 passengers; 1984—674 passengers.[9] We note, in passing, that the apparent decrease in the number of illegal aliens spotted argues in favor of—not against—the efficacy of the device. The lessening is more likely attributable to the deterrent effect of the procedure than to any loss of effectiveness.

In our case as at the Mexican border, approaching traffic is forewarned that an interrogation is in the offing. (Even before October 1984, when presently-existing signage was erected at the Isla Verde airport, 8 C.F.R. § 235.5(a) provided ample notice to the public of coming attractions.) In a manner perhaps less restrictive than in *Martinez–Fuerte,*[10] members of the gener-

---

105 S.Ct. at 310–11; *INS v. Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762; *United States v. Berryman,* 717 F.2d 650, 660–62 (1st Cir.1983) (en banc), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984). Our subsequent discussion assumes that the encounters are nonconsensual.

9. To be sure, the number of travellers actually in violation of the law is doubtless smaller than appears above; some of these "violators" were likely aliens with legal status, who merely lacked proper documentary verification. Once paperwork problems have been rectified, such aliens are allowed to proceed.

10. It can be plausibly argued that, if a traveller is not halted until it has become clear that he has heard and understood the citizenship inquiry, yet is purposefully withholding an answer, nothing more than a *consensual* encounter is involved. And, the thesis would run, the withholding of the answer gives rise to founded suspicion as a basis for further steps. One difficulty with this argument, however, is that there seems to be a difference between theory and reality. If INS follows its own procedure, *see infra* Part V(B), a passenger's ticket is to be taken before even the most preliminary questioning. This, of course, strongly implies a stop.

al public were not invariably stopped at a specific place, but were sometimes questioned in full stride by uniformed INS inspectors. In both instances, the checkpoints were operated under a prearranged format and in a "regularized manner," *Martinez–Fuerte,* 428 U.S. at 558–59, 96 S.Ct. at 3083, which diminished opportunities for freelancing by the agents in the field. Here (as in *Martinez–Fuerte*), the initial questioning regarding citizenship, as well as the subsequent secondary inspections, appear to us to be reasonable "minimal" intrusions upon the rights of persons affected. The scope of the initial inspections at Isla Verde, as at the border—the slowing of the traffic flow without bringing it to a dead halt, the posing of a single query, and the visual screening of those who pass—has been carefully tailored to the goal of intercepting illegal aliens. *See Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. Like the initial inspections, the secondary examinations, based on some articulable suspicion emanating from the original questioning, are conducted in a discreet fashion. The scheme as a whole seems for the most part to sweep no more broadly than is reasonably necessary. As we read *Martinez–Fuerte,* such procedures, subject to the single exception limned below, are entirely permissible.[11]

There is, furthermore, an additional analogy to be drawn. In our estimation,

the expectancy of privacy in a vehicle on the highway or within an airport, although not totally absent, is at least equally low. *See* 4 La Fave, *Search and Seizure,* § 10.6, at 3–37 (1987). *See generally United States v. Lopez–Pages,* 767 F.2d 776, 778 (11th Cir.1985). In fact, before boarding a flight, Lopez would have been required to pass a security checkpoint which boded a considerably greater intrusion than the questioning to which he was subjected regarding his citizenship.[12]

■ B. *Ticket Taking.* One aspect of the inspection procedures, however, remains troublesome. The district court explicitly found that INS agents "receive instructions to take the tickets of passengers while questioning them." *Lopez v. Aran,* 649 F.Supp. at 857. Consistent with the district court's finding on the point, we interpret this to mean that all tickets are to be taken before even the most preliminary question is asked and answered. Generally, people voluntarily surrender their tickets to the agents under the mistaken impression that they are airport personnel or officers of the airline; nevertheless, it is clear that the INS's policy is to gain possession of the tickets during questioning, regardless of consent. The trial court found that during the July 16, 1982 incident, INS agent Moreno took Lopez's ticket

Yet the actuality seems to be that often the ticket is not seized unless and until some threshold problem has developed. Given this inconsistency, we assume, favorable to appellant, that individuals are, from time to time, stopped before particularized suspicion has attached.

**11.** Our dissenting brother makes much of what he calls a "quarantine" or "imposed segregation" arising from the implementation of 8 C.F.R. § 235.5(a) ("... persons examined and found admissible shall be ... kept at the airport separate and apart from the general public until they are permitted to board the aircraft"). Pejorative terminology notwithstanding, we find this argument unconvincing. Appellant has never complained that he was placed in such a "quarantine." (Indeed, he did not challenge this portion of the regulation below or on appeal.) More important, the "quarantine" is not a quarantine at all: travellers, once cleared, go to a waiting room. They are, as we understand it, free to leave at any time—but if they do, they must submit themselves anew to the citizenship

inquiry upon returning. What the dissent terms "imposed segregation" is exactly the same procedure used in airports the nation over with respect to, say, security checkpoints. In point of fact, it is conceptually no different than placing prospective voters whose credentials have been examined and whose eligibility has been established in a separate holding area while they wait for a voting machine to become available.

**12.** We do not suggest that, because a security checkpoint is presumably valid, *e.g., United States v. Lopez–Pages,* 767 F.2d at 778–79; *United States v. Moreno,* 475 F.2d 44, 47–51 (5th Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973), searches or seizures conducted at airports for other reasons or purposes are *ipso facto* valid. It should be obvious that the peculiar hazards which led to the installation of security checkpoints at airports implicate somewhat different concerns than are triggered by the campaign to enforce the immigration laws. Each search or seizure must stand or fall on its own.

against his will and then proceeded to question him about his citizenship. *Id.* at 856.[13] Though the policy is in place, we note that the practice, apparently, is not an invariable one. For example, there was no evidence to indicate that Lopez's ticket was taken from him during the October 2, 1982 incident.

As we see it, the Constitution cannot abide the INS's policy of seizing passengers' tickets as a matter of course, before completing an initial inspection and without the slightest articulable suspicion that the ticketholder is an illegal alien. Several fourth amendment principles guide our (negative) evaluation of the ticket seizure policy. First, "[t]he predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect." *Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. Thus, we employ the balancing test to which we alluded earlier, *see supra* at 904–905, a delicate mechanism that weighs the public interest against an individual's right to freedom from such interference. *See Brown v. Texas,* 443 U.S. at 50, 99 S.Ct. at 2640; *United States v. Brignoni–Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578; *Terry v. Ohio,* 392 U.S. at 20–21, 88 S.Ct. at 1879–80. In approaching the scales, we recognize that shape as well as avoirdupois merits consideration; the dimensions of the seizure must be carefully tailored to its underlying justification, *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325, to the end that it not intrude more rudely than reasonably necessary.

Applying these principles, we have little trouble concluding that this part of the INS's policy, as currently voiced, transgresses the fourth amendment. Although the public interest in interception of illegal aliens warrants some limited intrusion, *see supra,* it does not justify arbitrary capture of a passenger's ticket without any basis for assuming that he or she may be an illegal alien. Indiscriminate seizure of everyone's tickets, on general principles and without any plausible ground for suspicion, substantially burdens the rights of travellers. Furthermore, unlike the initial and secondary inspections—which are carefully tailored to the ascertainment of a passenger's immigration status and to the goal of uncovering and intercepting illegal aliens, *see supra*—the heavy handed seizure of airline tickets is not so finely crafted. The policy suggests that INS agents should take the tickets of all passengers, including those whose (lawful) immigration status can readily be established by the most cursory questioning. Clearly, there is no need for so extreme a measure: the checkpoint is far removed from the boarding gate, and normal security is in place. In the absence of some hint that a passenger may not have valid legal status to travel to the mainland United States, the INS ticket seizure policy violates the fourth amendment.[14]

## VI

The final aspect of the case which we consider requires that we examine the INS's interference with Lopez's freedom to board the flight due to his refusal to answer the questions posed to him. This segment of the litigation, unlike the subjects discussed in Parts IV and V, *supra,* does not implicate the prayers for declaratory and injunctive relief. Rather, it centers around Lopez's claim against INS agents Figueroa and Aran for damages stemming from the events of October 2, 1982. *See generally Bivens v. Six Unknown Named Agents of FBN,* 403 U.S. 388, 390–97, 91 S.Ct. 1999, 2001–05, 29 L.Ed. 2d 619 (1971) (damages action possible against federal agents for abridgment of fourth amendment rights); *cf. United*

---

13. The plaintiff's claim regarding the July 16, 1982 incident was found by the trial court to be time barred. *Lopez v. Aran,* 649 F.Supp. at 865. That ruling has not been appealed. Nevertheless, although the incident itself is not actionable, it furnishes competent evidence of the ticket seizure policy.

14. We note that, once an INS agent has formed a reasonable suspicion about a passenger's immigration status, triggering a secondary inspection, then the taking of that person's airline ticket pending the further inquiry would appear to be entirely appropriate.

*States v. DeCologero*, 821 F.2d 39, 42 n. 3 (1st Cir.1987) (discussing availability of civil action where federal prisoner claims deliberate indifference to serious medical needs). The key sequence occurred during Lopez's secondary questioning by Figueroa. Appellant, it will be remembered, declined to answer the agent's inquiries anent citizenship. Instead, he handed Figueroa a card which read, "Do you suspect that I am an alien?" Having refused to respond to direct questions, appellant was not permitted to have his bags traverse the length of the conveyor belt nor could he pass through the departure gate. He sought out an Eastern Airlines supervisor to no avail. Lopez then retrieved his luggage, stormed out of the airport, and missed his plane.

It is clear that this interference with the appellant's freedom to board a flight for which he had purchased a ticket went well beyond the stop and preliminary questioning approved in *Martinez–Fuerte*. The intrusion was substantial enough to require, at the least, some level of reasonable justification, and ultimately perhaps probable cause, to validate it. As the Supreme Court recently wrote, "if the person[ ] refuses to answer [a question relating to his identity] and the police take additional steps—such as those taken in *Brown* —to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado*, 466 U.S. at 216–17, 104 S.Ct. at 1763; *cf. Brown v. Texas*, 443 U.S. at 53, 99 S.Ct. at 2641 ("appellant may not be punished for refusing to identify himself").[15]

The district court apparently concluded that, because the INS inspectors believed their inspection was not completed, they were entitled to forestall Lopez's departure as they did. *See Lopez v. Aran*, 649 F.Supp. at 867. Yet, the subjective belief of the agents does not, by itself, warrant substantial inroads upon appellant's freedom. If an official's state of mind, in and of itself, was sufficient to this end, then detentions of any length could be justified under the guise that an agent felt, subjectively, that his investigation was not finished. Put into proper focus, the analysis narrows to the question of whether the inspectors had an objectively reasonable and articulable suspicion that Lopez was an illegal alien *at the time they prevented him from boarding his flight.* The district court made no findings on whether the agents harbored reasonable suspicions about Lopez's immigration status at the critical time. As the record now stands, absent such findings, it is impossible to tell whether their conduct was or was not constitutionally sound.

The evidence in the current record is conflicting about both the substance and timing of what transpired. The appellant's behavior, first refusing to answer a simple question and then passing a card with a goading message, was likely enough to arouse reasonable suspicions about his right to enter the mainland. On the other hand, there was evidence in the record suggesting that, under the circumstances, blocking Lopez's passage might have been unreasonable. As matters now stand, absent specific findings, the uncertainties are pervasive. By way of illustration, we note that the district court found INS personnel "trained to discriminate on the basis of accent and other behavioral characteristics." *Id.* at 864. The record indicates that during Lopez's secondary inspection by Figueroa, plaintiff argued vehemently with the agent (and later with an airline official). Since Lopez, though never answering Figueroa's questions, nonetheless spoke at length, the INS staffers could perhaps have made a determination of Lopez's citizenship just as easily as if he had answered their questions. Indeed, this is exactly what happened during the July 16 incident

---

**15.** As we mentioned before, *see supra* at 904, inquiries as to citizenship, in the structured context of the departure gate, strike us as qualitatively different than random identity checks. In the former milieu, once it is ascertained that the individual has heard and understood but is willfully refusing to answer, there may well be sufficient justification to refuse passage pending further inspection. Yet here, the sequence of events is not clear and the conduct of the agents may have gone past the mark.

when agent Moreno, despite Lopez's refusal to answer the question posed, allowed Lopez to pass through because his accent indicated to her that the appellant was Puerto Rican. Then, too, there was evidence in the record that, in October, Aran had some knowledge of the July 16 incident. The district court, however, made no findings as to whether Aran knew that appellant had been the person who was involved in the earlier episode or whether any of the INS personnel knew him to be a United States citizen. Such findings, of course, would bear directly on the reasonableness *vel non* of the October 2 detention. And we note that Figueroa—perhaps the most important witness on the point— never testified in the district court.

In sum, the factual issue of whether the INS agents, at the time they impeded Lopez from boarding his plane, harbored reasonable suspicion that Lopez was an illegal alien, remains to be decided. That issue, in turn, is bound up with the question of the agents' qualified immunity under the doctrine of *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). We cannot tell from the record before us whether, given all of the circumstances, the contours of appellant's rights were "sufficiently clear that a reasonable official would understand that what he is doing violates [those] right[s]." *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Accordingly, the case must be remanded to the district court for further factual findings.

### VII

For all of the foregoing reasons, we hold that the basic INS protocol—the initial inspection and the subsequent stops and secondary inspection, as described above— comply, by and large, with the mandates of the Constitution. We also hold, however, that one portion of the protocol—the INS's policy of seizing tickets in advance of any reasonable suspicion of illegal status—offends the guarantees of the fourth amendment. We remand to the district court for the framing and issuance of an appropriate declaration of rights, and an injunction against the sweeping ticket-seizure policy, as now formulated. In the course of renewed proceedings below, the district court must also determine whether, under the circumstances then extant, the INS officers had a sufficiently reasonable suspicion that Lopez was an illegal alien so as to warrant the preventive measures taken on October 2, 1982. The court must consider, and make findings anent, the objective reasonableness of the agents' conduct, and preside over such other proceedings consonant herewith and/or ancillary to these matters as it deems meet.[16]

*Affirmed in part; reversed in part; remanded.* No costs.

TORRUELLA, Circuit Judge
(concurring in part; dissenting in part).

I concur in the majority's opinion to the extent that it declares invalid that part of the INS's inspection procedure which authorizes the taking of passengers' tickets during interrogation. *Ante* at 907–08. I also agree to the remand of the matters considered in Part VI of that opinion, *ante* at 908–910, although for different reasons than those expressed by my brethren. However, to the extent that the INS's preboarding procedure in the San Juan, Puerto Rico airport is otherwise validated as applied to citizens of the United States or persons legally within its borders, I dissent.

One byproduct of the majority's approval of the INS's "protocol" is to bestow upon me the dubious distinction, alone among all judges of the United States, of having to prove my citizenship and of being subjected to a search and seizure, at least once a month, before I can travel to this Court's place of sitting to exercise the duties of my commission. Although I do not rely on this personal example as rationale for my views, I recount it to dramatize the absurd-

---

**16.** Because remand is necessary in any event, we express no opinion on appellant's contention that Aran and Figueroa are also liable to him under P.R.Laws Ann. tit. 31, § 5141 (1968) for false imprisonment and intentional infliction of emotional distress. Those claims have yet to be passed upon by the district court. They are best considered in the first instance in that tribunal.

ity of the predicament forced upon the over two million citizens of the United States,[17] residents and non-residents of Puerto Rico, who annually pass thru San Juan's airport on their way to the mainland. All are subjected to an unconstitutional procedure which is neither justified by the exigencies of the circumstances or the practical results achieved.

The intrusion into passengers' rights caused by the INS "protocol" is particularly obnoxious because there are available to the authorities reasonable, more effective alternatives, and because the INS's intrusion is not in itself isolated but rather is imposed as the third of several governmental interferences suffered upon citizens departing San Juan's airport for the mainland. Such persons must first subject themselves to a stop and search by the United States Department of Agriculture.[18] Next, the Federal Aviation Administration requires another checkpoint for security purposes.[19] And finally, the INS stops and seizes the passenger pursuant to its "protocol."[20] Thus the San Juan airport is truly a bureaucratic paradise in which each succeeding agency carves for itself its own empire within which to emulate an Orwellian "Big Brother."

### I

In an attempt to fit the facts of this case within the embrace of *United States v. Martínez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the majority "bifurcate[s] for analytic purposes" the INS "protocol." *Ante* at 905. Although this alluring technique shows awareness of the warning in *Martínez–Fuerte* that its holding is limited "to the type of stops described in [that] opinion," *id.* at 567, 96 S.Ct. at 3087, the present case cannot be so easily pigeon-holed.

The majority's analysis is wrong for various reasons. First of all, by fragmenting what is in fact a *unified* procedure, it gives the government what amounts to a prohibited advisory opinion. *United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1960). *See also United States v. Sharpe*, 470 U.S. 675, 726 n. 17, 105 S.Ct. 1568, 1596 n. 17, 84 L.Ed.2d 605 (1984) (Stevens, J., dissenting). The question presented to this Court is not, would the INS "protocol" be valid absent parts "A" or "B" of its procedure, or if "X" or "Y" were added. The issue presented below and before us is whether the *existing* "protocol," *all of it as presently constituted,* passes constitutional muster. Contrary to the analysis in Part V of the Court's opinion, *ante* at 905–08, the record does *not* show a practice in which the initial inspection and questioning of passengers by INS can be separated from the "instructions [given to the inspectors] to take the tickets of passengers while questioning them," *López v. Aran*, 649 F.Supp. 853, 857 (D.P.R.1986).

The questioning and the ticket seizure are coetaneous. The facts of this case establish an amalgamated procedure under which, pursuant to 8 C.F.R. § 235(a) (1986), prior to allowing a citizen to depart Puerto Rico for the mainland, the passenger is subjected to interrogation about citizenship while his or her ticket is in possession of

17. *The Tourism Industry of Puerto Rico, Selected Statistics (1986),* Tourism Company of Puerto Rico, Office of Statistic & Economic Studies, Table I, p. 3.

18. *See* 7 C.F.R. § 318.58–11, –14 (1987).

19. *See* 14 C.F.R. § 107.3 (1987).

20. *See* 8 C.F.R. § 235.5(a) (1986):
    *In the United States territories and possessions.* In the case of any aircraft proceeding from Guam, Puerto Rico or the Virgin Islands of the United States destined directly and without touching on any foreign port or place ... to one of the States of the United States or the District of Columbia, the examination re-

quired by the act of the passengers and crew may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure ... When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he is found to be admissible as provided in this section.

the INS inspector, and thereafter, if the inspector determines that the passenger is a citizen or is legally in the United States, the passenger must remain isolated from the general public until departure of the aircraft.

This procedure is patently distinguishable from *Martinez–Fuerte* in two important ways, only one of which is recognized as such by the majority. The first difference lays in the seizure during interrogation of the passenger's ticket, even absent what the majority refers to as "some hint" that the passenger is illegally within the United States. *Ante* at 908. Of course more than a mere "hint" is required for such a seizure, *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), but be that as it may, the fact remains that this seizure is not a separate incident in the passenger's stop and interrogation but rather an integral part of the same. Its obviously intended purpose is to prevent freedom of action by the subject. *Royer*, 461 U.S. at 501–02, 103 S.Ct. at 1326–27. The excision of this intrinsic act, for "analytic purposes" or otherwise, simply runs contrary not only to reason, but more importantly, to the record which unequivocally reveals that "[t]he agents ... receive instructions to take the tickets of passengers *while questioning them*," *López*, 649 F.Supp. at 857 (emphasis supplied).

The second important distinguishing feature found in this case, not present in *Martinez–Fuerte*, is the isolation or quarantining of the passengers from the general population, once they have "passed" the INS's "protocol." The purpose of this imposed segregation is, of course, obvious; it is an effective means of keeping uncontaminated those passengers who have passed INS's "protocol." But I assume that no one would in this day and age suggest, merely because a law enforcement tool is effective, that it is automatically constitutional. I do not see how such an additional restriction, even if considered separately, and much less if weighted in the context of this entire procedure, can be valid.

The approval of such a restriction can only stem from an implicit acceptance that a border, "secondary" or otherwise, exists between Puerto Rico and the mainland, allowing INS to do between San Juan and the mainland what it normally could only do to passengers crossing an *international border* of the United States; that is, isolate them until they have entered or detain them upon reasonable suspicion of a crime being committed. *United States v. Montoya de Hernández*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Yet this clearly is not permissible here, as no border exists between Puerto Rico and the mainland for immigration purposes, and legal residents of Puerto Rico can freely travel to the mainland without any restriction. *Balzac v. People*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Savoretti v. Voiler*, 214 F.2d 425, 427–28 (5th Cir.1954) (no "entry" for immigration purpose when resident alien returns to mainland from Puerto Rico); 8 U.S.C. § 1101(36), (38) (1982) (Puerto Rico is within the United States for immigration purposes). *See also Torres v. Puerto Rico*, 442 U.S. 465, 472–73, 99 S.Ct. 2425, 2430–31, 61 L.Ed.2d 1 (1979) (no "intermediate border" exists between Puerto Rico and United States); *cf. Gonzáles v. Williams*, 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317 (1904).

The majority agrees that no "secondary" border exists, *ante* at 901–02, yet permits a procedure, quarantine, which is only valid, even in a criminal or public health context, when crossing international borders if a "reasonable suspicion" standard is met. *United States v. Montoya de Hernández, supra. See* 19 U.S.C. § 1582. In fact, the INS's "protocol" is more intrusive of the passengers' freedom than when crossing an international border. Not only is there a stop and seizure during the interrogation regarding citizenship, but even after the passenger "passes" this gauntlet, his freedom is further curtailed by his having to remain "separate and apart from the general public." 8 C.F.R. § 235(a) (1986).

An alternative ground to explain this situation may be the possible misconception that INS can constitutionally do in Puerto Rico what it cannot do in the States of the

Union. The basis for this assertion is the fact that the predecessor to 8 U.S.C. § 1182(d)(7), the statutory authority from which 8 C.F.R. § 235.5(a) derives, included not only Puerto Rico and the other territories mentioned in 8 U.S.C. § 1182(d)(7) and 8 C.F.R. § 235.5(a), but also Hawaii and Alaska. Upon their admission as states, the procedures questioned in this case were amended and made inapplicable to passengers traveling from Hawaii and Alaska to the mainland. *See* Sec. 23, Act of July 7, 1958, 72 Stat. 351 and Secs. 19–21, Act of March 18, 1959, 73 Stat. 12. *See also* 8 C.F.R. § 235.5 (1958 & 1959). However, Puerto Rico's constitutional status is irrelevant to the validity of the challenged procedure because the requirements of the Fourth Amendment are as fully applicable in Puerto Rico as in the States. *Torres v. Puerto Rico, supra.* Yet notwithstanding recognition by the majority of this general concept, *ante* at 902, its decision validates a procedure which allows the restriction of a passenger's movement, by isolation, not only when probable cause is lacking but even after the INS has *full knowledge that no crime has been committed at all.*

This brings to mind Footnote 4 of *United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938), in which the Supreme Court established a standard of "strict scrutiny" for judicial review of regulations which discriminatorily treat "discrete and insular minorities" lacking significant access to the representative process. There is no question that appellant is a member of a class most seriously affected by this "valueless and discriminatory" regulation. It would be difficult to imagine a more "discrete and insular" minority, both geographically and constitutionally, than the residents of Puerto Rico. And these persons, despite their citizenship in the United States, 39 Stat. 1132 (1917), have virtually no access to "the operation of those political processes ordinarily to be relied upon to protect minorities." *Carolene Products Co., supra.*

[T]he fact of powerlessness is crucial, for in combination with prejudice it is the minority group's inability to assert its political interests that "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities." The very powerlessness of a discrete minority, then, is itself the factor that overcomes the usual presumption that " 'even improvident decisions [affecting minorities] will eventually be rectified by the democratic process.' "

*Toll v. Moreno,* 458 U.S. 1, 23, 102 S.Ct. 2977, 2989, 73 L.Ed.2d 563 (1982) (Blackmun, J., concurring) (citations and italics omitted). If proof of the above be needed, note the eloquent fact that Hawaii and Alaska have, since gaining access to the political processes, been excluded from the challenged "protocol."

Yet notwithstanding the confluence of all of the *Carolene Products* factors, the majority applies, rather than strict scrutiny, a highly deferential standard of review to these procedures. I believe we owe a higher duty to the affected citizens. *See* Ball, *Judicial Protection of Powerless Minorities,* 59 Iowa L.Rev. 1059 (1974). *Cf. Sugarman v. Dougall,* 413 U.S. 634, 642, 93 S.Ct. 2842, 2847, 37 L.Ed.2d 853 (1973); *In re Griffith,* 413 U.S. 717, 721, 93 S.Ct. 2851, 2854, 37 L.Ed.2d 910 (1973). *See also Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 556, 105 S.Ct. 1005, 1020, 83 L.Ed.2d 1016 (1984).

The statute and regulation in question require a double inspection and double showing of compliance with immigration requirements for persons entering a territory and then proceeding to mainland United States. Gordon and O. Rosenfeld, *Immigration Law and Procedure,* Vol. 1, 2.4c, 2–38. In its report to the President, the Commission on Immigration and Naturalization commented against the discriminatory nature of this procedure.[21] The then Director of the Office of Territories, United States Department of the Interior,

---

**21.** *Whom We Shall Welcome, Report of the President's Commission on Immigration and Naturalization* (1953) in Trelles and Bailey, *Immigra-* *tion and Nationality Acts—Legislative History and Related Documents,* Vol. 6 at 183 (1979).

James P. Davis, testified as follows regarding the "protocol" in question:

> The requirement appears to us to be burdensome, valueless and discriminatory.... [Moreover], in order adequately to enforce the provision, it appears that all persons traveling from the territories to the continental United States, whether they be citizens or aliens, will necessarily be screened in some manner. Until regulations for the enforcement of Section 212(d)(7) are issued, we cannot know what form this screening process will take. But enforcement authorities cannot determine whether an alien has met the requirements of Section 212(d)(7) unless they are first able to determine whether he is or is not an alien. It therefore appears reasonable to assume that United States citizens, as well as aliens will be required either to carry documentation or to submit to questioning before they are allowed to enter the United States from the territories. Introducing such complications to travel between the territories and the continental United States can produce no salutary consequences.... We urge, therefore, that Section 212(d)(7) be entirely struck from the act, and that the territories to which the act applies be treated, for all purposes, as parts of the United States.[22]

The above discussion is relevant not only to establishing a distinction between *Martínez–Fuerte* and the present situation, but also as background to the application of the balancing test to which the INS's "protocol" must be submitted pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), and its progeny. *See Martínez–Fuerte*, 428 U.S. at 566, 96 S.Ct. at 3086; *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640. Again, although the majority recognizes the relevance of this balancing test to the situation at hand, it misapplies the same. *Ante* at 905 *et seq.*

As the first component of this test one looks to the gravity of the public concerns served by the seizure.[23] *Brown, supra,* 443 U.S. at 51, 99 S.Ct. at 2640. As noted recurrently by the Supreme Court, it cannot be disputed that the presence of large numbers of illegal aliens in this country is a national problem raising serious issues of public concern. *See Martínez–Fuerte, supra,* 428 U.S. at 551–53, 96 S.Ct. at 3080–81. It is, however, a problem which primarily concerns illegal entry along the 2,000 mile-long boundary with Mexico. *Id.* at 551, 96 S.Ct. at 3080. In comparison with that situation, the entry of illegal aliens into the United States through Puerto Rico, almost exclusively from the Dominican Republic, is insignificant. *See López, supra,* 649 F.Supp. at 857–58, 867. Furthermore, when I consider the degree to which the seizures here in question advance the public interest, which is the second component of the *Terry* test, it is clear that the airport checkpoint in this case plays a *de minimis* role in the enforcement of the immigration laws of the United States. *Cf. Martínez–Fuerte, supra,* 428 U.S. at 554, 96 S.Ct. at 3081 (17,000 illegal aliens apprehended in the California checkpoint in one year) with *López, supra,* 649 F.Supp. at 858 (674 illegal aliens, out of 2,000,000 northbound passengers, apprehended in the San Juan airport checkpoint in 1984). These figures seem to establish that the principal effect of the San Juan airport checkpoint is the containment of illegal aliens *in* Puerto Rico, not their interception at the airport.[24] Not only is there an absence of a record of empirical data demonstrative of the effectiveness of *this* airport checkpoint as a law enforcement technique, *cf. Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979), but the record is bare of any evidence that other, less intrusive methods, have been attempted but are ineffective. *Cf. Martínez–Fuerte, supra,* 428

---

**22.** *Id.* at 1431–32.

**23.** There should be no question but that the INS's "protocol" is a seizure within the meaning of the Fourth Amendment. *Martínez–Fuerte,* 428 U.S. at 566, 96 S.Ct. at 3087.

**24.** As can be seen from the statistics quoted by the district court, the apprehensions at the airport dropped to one third in 1984 from what they were in 1982. *López, supra,* 649 F.Supp. at 858.

U.S. at 552–53, 96 S.Ct. at 3080–81. There is, for example, no evidence that the Border Patrol is even active in Puerto Rico, or that the Mona Passage between the Dominican Republic and Puerto Rico, which is the crossing-point for the great majority of the illegal aliens into Puerto Rico, *López, supra,* 649 F.Supp. at 858, is patrolled with any regularity for the purpose of intercepting illegal entrants. What does appear is that the INS has taken the easiest way out, which regardless of effectiveness, causes a serious intrusion upon the millions of United States citizens transiting the San Juan airport on their way to the mainland.

Last should be considered the third *Terry* component, the severity of the interference with individual liberty which is caused by the seizure in question. As previously indicated, I believe that the stop and interrogation of the passengers at the airport checkpoint, when coupled with a seizure of their ticket and followed by their isolation, constitutes a major interference with the liberty of individuals subjected to this procedure. It cannot validly be equated to the minimal interference of the checkpoint stops in *Martínez–Fuerte.* In my view the INS "protocol" when taken as a whole is clearly unconstitutional.

The internal control of travel within the United States has never been constitutionally sanctioned and is contrary to our traditions. *The Passenger Cases,* 7 How. 283, 492, 12 L.Ed. 702 (1849) ("We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own states."). *See also Shapiro v. Thompson,* 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969). Although *Martínez–Fuerte* can arguably be considered a step in the direction of allowing such internal travel controls, it may perhaps be justified on the scale of the *Terry* balancing test. The INS's "protocol" in San Juan goes two steps further

than *Martínez–Fuerte,* however. We should move slowly and with caution before approving the use of law enforcement methods which bring about wholesale intrusion into the privacy of large numbers of the citizenry, particularly where the need and effectiveness of those methods is questionable. The unwarranted validation of the application of these methods to the United States citizens traveling through the San Juan airport could well establish a precedent for its extension to the airport in Kansas, or Mississippi, or for that matter—Nantucket. *See* Catz, *Fourth Amendment Limitations on Nonborder Searches for Illegal Aliens: The Immigration and Naturalization Service Meets the Constitution,* 39 Ohio St.L.J. 60 (1978); Note, *United States v. Martinez Fuerte: The Fourth Amendment—Close to the Edge?,* 13 Cal. W.L.Rev. 333 (1977).

## II

There only remains my explanation as to why I concur with the majority's conclusion as to Part VI, but not as to its reasoning.

My objection to this reasoning is with reference to the majority's conclusion regarding the INS's actions in "imped[ing] López from boarding his plane." *Ante* at 910. There can be no question that the INS harbored *no* reasonable suspicion that López was an illegal alien. Had this suspicion existed we can take for granted that he would have been detained further. Instead, he was allowed to retrieve his baggage and leave. In not allowing López to board after they obviously knew that he was not an illegal alien, the INS inspectors were manifestly harassing López for objecting to the unconstitutional procedures which were being applied to him. Thus no question of qualified immunity is presented by these clearly illegal actions and the remand should be solely for a determination of the damages suffered by López. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981).[25]

**25.** The majority correctly concludes that merely refusing to answer an agent's query is not grounds for any further detention, absent some minimal level of objective justification to val-

idate such a seizure. *Ante* at 904–905, 909; discussing *I.N.S. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357

III

In conclusion I can only hope, as was once expressed by Justice Field, "that this, like other errors, will, in the end 'die among the worshipers.'" *Baltimore & Ohio R.R. v. Baugh*, 149 U.S. 368, 403, 13 S.Ct. 914, 928, 37 L.Ed. 772 (1893) (dissenting).

(1979). Nonetheless, contrary to the articulated standard, the court found that refusal to answer and passing a card with a "goading message" may have presented that minimal level of objective justification. *Ante* at 909. Given the circumstances of this search and seizure, it is difficult to conclude that showing the message in the card would have caused a higher level of suspicion in the minds of the agents than remaining totally silent; *i.e.,* can it earnestly be argued that if López had remained silent, the INS agents would have allowed him to proceed? Quite obviously not. The card is thus immaterial in terms of meeting the standard enunciated in *Brown,* and accepted by the majority.